## REICHMAN v. HARRIS.

## McCONNELL et al. v. SAME.

(Circuit Court of Appeals, Sixth Circuit. June 29, 1918.)

Nos. 3055, 3070.

1. EXTRADITION ⟨⟩32—INTERSTATE EXTRADITION—SUFFICIENCY OF CHARGE.
In proceedings for the rendition from one state to another of persons charged with crime, courts will not indulge in technical tests of the sufficiency of a charge, where it substantially describes the crime, if there is some appropriate allegation and evidence that a charge has in reality been duly made in the state where the crime is alleged to have been committed.

2. EXTRADITION ⟨⟩32—STATE EXTRADITION—SUFFICIENCY OF CHARGE.
In a proceeding before a magistrate for the arrest of a person charged with crime in another state, brought in the state to which he is alleged to have fled, it must appear that in the state where the crime was committed he stands charged through indictment or affidavit before a magistrate, or by some other equivalent accusation sanctioned by the laws of that state.

3. FALSE IMPRISONMENT ⟨⟩12—FUGITIVES FROM JUSTICE—WARRANT—SUFFICIENCY.
A warrant issued by a justice to arrest an alleged fugitive, issued on information on oath "that the offense of fugitive from justice has been committed and accusing M. H. thereof," even if considered in connection with oath reciting that accused had unlawfully entered state from Mississippi, "where he is charged with the crime of murder," was not fair and regular on its face, but void, as failing to state how, or under what competent official sanction, accused was charged in Mississippi, in view of Thomp. Shan. Code Tenn. §§ 7323, 7324, 7326, and Rev. St. U. S. § 5278 (Comp. St. 1916, § 10126).

4. FALSE IMPRISONMENT ⟨⟩12—DEFENSES—VOID WARRANTS.
A void warrant, not fair and regular on its face, affords an officer attempting to serve it no protection as against an action for false imprisonment, since he is chargeable with knowledge of its defects.

5. HOMICIDE ⟨⟩111—RESISTANCE OF ARREST—JUSTIFICATION.
Although a person may with reasonable force resist an officer attempting unlawfully to arrest him, yet his resistance must be proportionate to the danger threatened, and he may not kill the officer, unless the circumstances fairly and honestly lead him to believe that he is in imminent danger of death or great bodily harm.

6. FALSE IMPRISONMENT ⟨⟩39—RESISTANCE TO ARREST—INSTRUCTIONS.
In an action for false imprisonment, involving infliction of personal injury by defendants acting under a void warrant while attempting to enter plaintiff's house, where the evidence was conflicting as to the grounds for plaintiff's resistance, it was error to grant motion to direct a verdict.

7. SHERIFFS AND CONSTABLES ⟨⟩100—LIABILITY FOR ACTS OF DEPUTIES.
Where the act of the deputy sheriff is an official act and causes an injury, the sheriff is answerable, if the act is done in execution of the deputy's office, even though he may be mistaken as to the lawfulness of the act.

8. FALSE IMPRISONMENT ⟨⟩19—PARTIES—JOINDER.
In an action for false imprisonment, brought against a sheriff and his deputies, the sheriff was properly joined with the deputies as parties defendant, notwithstanding they both acted in their official capacity.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

9. Courts ⊜⟹352—Jurisdiction—Federal Courts—Diversity of Citizenship—Special Findings.

In an action for false imprisonment, where on the issue as to jurisdiction based on diversity of citizenship it was specially found that plaintiff "is and was a resident of the state of Mississippi at the day of bringing this suit," such finding was sufficient to sustain an inference that plaintiff was both a citizen and resident of the state of Mississippi, and that therefore the court was vested with jurisdiction.

In Error to the District Court of the United States for the Western District of Tennessee; John E. McCall, Judge.

Action by Mathew Harris against J. A. Reichman, L. F. McConnell, J. W. King, and others for false imprisonment. Judgment was entered against all defendants except Reichman for compensatory and exemplary damages, and against Reichman for compensatory damages, and a new trial was denied to all defendants except King. Reichman severed, and brought separate writ of error, whereupon other codefendants secured leave to bring error in forma pauperis, and proceedings in error of McConnell alone were brought into the record, and the proceedings were heard together. Reversed and remanded.

Charles M. Bryan, of Memphis, Tenn., for plaintiff in error Reichman.

Province M. Pogue, of Cincinnati, Ohio, and William P. Metcalf and Elias Gates, both of Memphis, Tenn. (Pogue, Hoffheimer & Pogue, of Cincinnati, Ohio, and Metcalf & Metcalf and Gates & Martin, all of Memphis, Tenn., of counsel), for plaintiffs in error McConnell and others.

James H. Malone and John E. Bell, both of Memphis, Tenn., for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. Mathew Harris, in an action for false imprisonment, involving in aggravation of damages alleged unlawful invasion of his home and arrest of himself and infliction of serious personal injuries,[1] recovered a verdict against the following defendants: J. A. Reichman, Walter Lee, L. M. Linson, L. F. McConnell, Ed. Bradley, Ira Williams, and J. W. King—for $22,500 as compensatory damages, and also a verdict against all these defendants, except Reichman, for $22,000 as exemplary damages, and judgment was entered accordingly. A new trial, however, was granted in favor of King, though denied as to the other defendants. Reichman procured an order of severance and sued out a separate writ of error, upon failure of his codefendants in the judgment rendered against him and them jointly to unite with him in prosecuting error. Later, however, these codefendants secured orders allowing them to prosecute writs of error in forma pauperis, and under stipulation of counsel the bill of exceptions and the printed record prepared in the Reichman proceeding are to be treated as filed on behalf of all the

---

[1] Relying on Burson v. Cox, 6 Baxt. (Tenn.) 360, 363, 364, as to the character of action ultimately adopted.

defendants below who are prosecuting error, and further the proceedings in error of L. F. McConnell are identical in form with all the other proceedings allowed in forma pauperis, though the latter are omitted from the printed record to save expense. The two cases in error were consequently heard together in this court, and they will be disposed of in one opinion.

The recoveries in issue were based upon acts and injuries charged against all the plaintiffs in error, and committed for the most part at the residence of Harris on the night of October 26, 1915, though he also relies on other and later wrongful acts and injuries. Harris resided at the time in Capleville, near Memphis, Tenn., and the whole trouble and injury grew out of efforts to arrest a claimed fugitive from justice, who was erroneously supposed to be at the residence of Harris on the night in question. Reichman was then the sheriff of Shelby county, Tenn.; Lee, Linson, Bradley, and Williams were deputy sheriffs under Reichman; and McConnell was a constable of the county. Lee, having information that Manuel Harris (a nephew of plaintiff) was "wanted for murder in Mississippi," secured on his own oath a warrant from a justice of the peace of Shelby county, October 18, 1915, to arrest Manuel Harris for "the offense of fugitive from justice." Through previous arrangement Lee received a telephonic message from a storekeeper at Capleville, just after dark on the evening of October 26, that "a strange negro, supposed to be the nephew of Mathew Harris," "had gone down to Mathew's residence," and that if Lee "would come down right away" he "could get him." Thereupon Deputy Sheriffs Lee and Linson, with at least two other men, went in an automobile to a point near plaintiff's residence, when the two deputies proceeded on foot to the residence. They took positions at the only outer doors of the house. Lee at the front and Linson at the back door. Alarm and trouble were aroused almost immediately, and there is conflict between the testimony of the inmates of the house and that of Lee and Linson as to some of the initial and important facts. In view of the contentions of counsel and certain rulings of the learned trial judge, it will be helpful to look into this part of the testimony.

Mathew Harris and his wife, with their little child and their nephew, Isiah Griffin, were the only persons inside the house; it is certain that Manuel Harris was not there. Harris, his wife, and the nephew testify that between 7 and 8 o'clock in the evening some one came to the front of the house (to the door, as the wife says) and called out for Mathew Harris; that the wife asked, "Who are you?" or "Who is that?" but "they would not tell who they were." She, however, answered that Mathew Harris was not there, but that her nephew and little child were there. She was then told to have her nephew "to come out here." The nephew testifies that he picked up a pistol and opened the back door to see who was there, when (in his language) "somebody shot at me, and the smoke burned my head, and I knocked the door to, and fell inside the house," and his aunt cried out, "You have done shot my child." He says some one then called out: "Stand

there with your pump gun; kill him if he tries to come out; don't let anybody out." The witness says, further, that he "never fired a shot that night." However, two of the men remaining in the automobile testify that, when the first shooting occurred at the rear of the house, two shots were fired; and Mathew, his wife, and the nephew all testify that within the house the way to the front door was obstructed by an unfolded bed, which usually necessitated using the back door when passing into or out of the house in the evening. Mathew Harris says the men "refused to tell who they were, and I did not know who they were"; his wife saying, "The first time I knew they were white men was when I got outside the house that night." Harris and his wife and nephew all testify in effect that none of the men stated at any time that evening that he was an officer, or that there were any officers there.

On the other hand, Lee testifies that he knocked on the door, that Mathew's wife asked, " 'Who is that?' and I said, 'Is Mathew here?' She said, 'No, he is not here,' and she said, 'Who is that?' and I said, 'This is an officer; come to the door a minute; I want to see you.' " Lee also says, upon hearing persons inside the house walking towards the back door, he called to them: "Do not go out that back door; there is an officer at the door. * * * There is four officers around this house." Linson testifies that he heard Lee knock at the front door and call out: "You need not try to run out the back door. * * * You can't run out the back door. The house is surrounded with officers, and you can't get away." Further, that a half minute later he heard the back door open; that "this boy walked out the door, and the thought struck me—I had my pistol drawn on him, I would let him get out far enough so he could not jump back in the house before he saw me, and I saw a pistol in his right hand, * * * and I saw some one else coming out the door with a Winchester rifle, and I stepped to the corner of the house, and said, 'Get back in there before I kill you,' and when I said that the boy turned right around and started back in the house, and just as he entered the door he shot at me, and I tried to shoot him in the head at the time"; and further that the boy's shot "was the first shot fired that night; I had not fired any before that." Lee, referring to this matter, said: "There were no more shots fired in the back, but when these two shots were fired Linson hollered to me, 'Look out! they are coming back in there,' and at this time I had done opened this front door—it had one of those cheap locks on it—and I turned the knob and went in the hall and started in this room and turned the door open." Upon going farther into the house and using a flashlight, he required Mathew's wife to precede him, stating that with her ahead of him he did not think there would be any shooting, but that she turned into another room, and Mathew then shot at him with a Winchester rifle. Mathew admits firing the rifle, but says: "I shot to make him get back. I did not know what he was up to. I shot at the light. I did not know who he was; he did not tell me his name or nothing." According to the testimony of the defendants, this was the third shot fired; but Mathew Harris and

his nephew, Isiah Griffin, testify that a number of shots had been fired into the house from the outside, particularly from the front, before Mathew fired. In speaking of the shooting at the back door, when his nephew fell and his wife screamed, as already stated, Mathew says: "About that time the man on the front shot three or four times, and of course I was excited." Another feature of the evidence is: Harris and his wife and the nephew in effect testify that none of the officers stated that they were seeking Manuel Harris or even mentioned his name; while Lee testifies that he told the wife he had "come for Manuel Harris, supposed to be Mathew's nephew."

It is insisted for the defendants that the testimony thus far alluded to tends to show the commission of two felonies, one by plaintiff's nephew, Isiah Griffin, in firing as it is claimed upon Linson, and the other by plaintiff himself, Mathew Harris, when he fired at Lee, and that these were crimes committed in the presence of the officers, and so justified the course they pursued, even though they resorted to the use of firearms in effecting an entrance into the home of the plaintiff. The trial court instructed the jury, on motion of counsel for plaintiff, that the verdict should be "one of liability" against all the present plaintiffs in error. This left only a question of plaintiff's citizenship and the amounts of damages, compensatory and exemplary, to be considered by the jury. Upon these subjects we shall have something further to say; but neither the claim so urged by counsel nor the ruling of the court can be fully understood without calling attention to still further facts, since it is contended for Harris that the officers so far abused any legal authority they may have possessed as to condemn them as trespassers ab initio.

The rest of the testimony hardly can be said to be in material conflict. When Mathew Harris fired his shot, Lee left the house, and subsequently broke a window and placed a metal pail of burning sulphur in the house to drive the inmates out. The wife and her little child came out, and were directed to go to another person's house in the neighborhood. Mathew and the nephew, however, remained inside, though, as the deputies state, they were told that they might safely come out, if in doing so they would hold up their hands; but Mathew testifies that these men said they would kill him, and that he was afraid to go out. Many shots were meanwhile fired into the house, and Mathew was severely wounded. Later, dynamite was used, which resulted in blowing up part of the house; Mathew stating it "tore up everything." One of Mathew's eyes was blown out, an arm and hand and one of his legs were mutilated, so that he seems to have been reduced from a strong man, an efficient blacksmith, to a lifelong cripple, unfit for his occupation. In bringing about these results Lee and Linson called to their aid the other deputies and the constable, plaintiffs in error, and also outsiders; and the services of these men were enlisted upon representations of Lee and Linson that the two felonies before mentioned had been committed in their presence. Towards morning Mathew and the nephew were removed to the automobile, tied together, and carried to Memphis—Mathew to a hospital and the nephew to the jail.

To justify the violence resorted to, Lee says he thought Manuel Harris was in the house, and that, in view of the felonies claimed to have been committed in the presence of the officers, as stated, no more force was exerted than was necessary to effect arrests on that account, as well as the arrest of Manuel Harris. Later Lee gave directions at the hospital to have him notified when Mathew Harris might be in condition to leave. This was carried out, and Lee threatened to take him to jail unless he would give bail; and a bond was given. It appears that for firing the shot in his house on the night in question Mathew Harris was indicted for an assault with intent to commit murder; that he was tried and convicted in the criminal court of Shelby county, but that the verdict was set aside and a new trial granted; and that later he was discharged, "either upon an agreed verdict of not guilty or at the direction of the Attorney General for Shelby county."

We have here a remarkable instance of the conflict that may arise between persons who, through misconception on one side or on both sides, seek to exercise or enforce rights designed for the common security alike of the public and of the individual home. Here were officers entitled as well as bound rightly to enforce the law, and a private individual entitled to protection against wrongful invasion of his home. It must be apparent that to resist an officer in the lawful exercise of his right to arrest is as reprehensible as it is for an officer wrongfully to enter the home of a private individual.

We come to the defenses specified in the pleas of the plaintiffs in error. All united in a plea of the general issue, and the deputy sheriffs and constable interposed additional pleas, alleging that they were acting in their official capacities as lawful officers of Shelby county, and setting up in justification of their acts: (1) The warrant secured, as already stated, from a justice of the peace of Shelby county to arrest Manuel Harris as a fugitive from justice; (2) the charge, above pointed out, that Mathew Harris assaulted Walter Lee with intent to commit murder, a felony under the laws of Tennessee, stating (a) that the assault was committed in the presence of the officers, and (b) that the officers had reasonable grounds to believe the offense had been committed, and that as such officers of Shelby county they were "authorized to make arrest," that they sought to arrest Mathew Harris, were resisted by him, and used no more force than was necessary to overcome his resistance; and (3) a warrant subsequently issued by a justice of the peace of Shelby county, to wit, October 29, 1915, for the arrest of Mathew Harris because of an alleged "offense of assault to murder." Reichman, the sheriff, relies on all these features of the pleas, except the one in relation to the warrant for arrest of Manuel Harris as a fugitive from justice; but it will conduce to clearness if we first consider the defenses of the deputies and the constable.

1. At the very threshold of the claimed justification, we are met with contention for plaintiff that the warrant for the arrest of Man-

uel Harris was void; and such was the ruling of the court below. A copy of the warrant and of the oath upon which it was issued appears in the margin.[2]

It is not claimed that any proceeding had been instituted in Mississippi looking to the indictment or arrest of Manuel Harris. The only reason disclosed by the record for seeking the issue of this warrant is that in July, 1915, a letter was received at the office of the sheriff of Shelby county, Tenn., from the sheriff of Tunica county, Miss., stating that Manuel Harris had "committed murder, and there was a reward for him." The letter was not produced. Lee testifies that he made a note of it in his book July 16, 1915; that he had information that Manuel Harris was stopping "every now and then at Mathew Harris' home," though he specifically denies that he was "acting individually to get that reward." It will be observed that Lee states in the oath he made to secure the warrant that on the ———— day of October, Manuel Harris unlawfully entered the state of Tennessee, "a fugitive from justice from the state of Mississippi, where he is charged with the crime of murder"; and so far as appears this was the sole basis for the statement shown on the face of the warrant:

"Information on oath having been made that the offense of fugitive from justice has been committed, and accusing Manuel Harris thereof."

It had been provided by statute of Tennessee that any magistrate might, upon stated conditions, issue a warrant to arrest any person found in the state "charged with any crime committed in any other state, * * * and liable by the Constitution and laws of the United States to be delivered over upon the demand of the Governor thereof." One of the conditions, additional to that just quoted, upon which such a warrant may be issued is the presence of "complaint, on oath, setting forth the offense and such other matters as are necessary to bring the case within the provisions of law." "If, upon examination, it appear that there is reasonable cause to believe the complaint true, and that such person may be lawfully demanded of the Governor," he may be committed or required to give bail according to the nature of the offense charged, "allowing sufficient time to obtain the warrant

---

[2] State of Tennessee, Shelby County—ss.: To Any Lawful Officer of the State: Information on oath having been made that the offense of fugitive from justice has been committed, and accusing Manuel Harris thereof.

You are hereby commanded, in the name of the state, forthwith to arrest Manuel Harris and bring him before me, or some other magistrate of said county to answer the charge.

Given under my hand and seal, this 18th day of October, 1915.

John M. Maher, J. P. [Seal.]

State of Tennessee, Shelby County: Before me this day personally appeared Walter Lee and made oath that Manuel Harris did, on the ———— day of October, 1915, in said county, and within the jurisdiction of the criminal court of Shelby county unlawfully enter into the state of Tennessee a fugitive from justice from the state of Mississippi, where he is charged with the crime of murder, against the peace and dignity of the state, and contrary to law.                    Walter Lee.

Sworn to and subscribed before me, this 18th day of October, 1915.

John M. Maher, J. P. [Seal.]

from the Governor." At the end of such time "he shall be discharged unless he is demanded under warrant of the Governor, or unless the magistrate see good cause to commit him to some other day, or to require him to give bail for his appearance at such day, to await a warrant from the Governor." Sections 7323, 7324, and 7326, Shannon's Code (Ed. 1896); Id. (Ed. 1917).

Although no judicial interpretation of this statute has come to our attention, yet the first inquiry naturally arising under the statute is whether the warrant discloses facts which would sanction its issue. In other words, is the warrant fair and regular on its face? . This requires consideration of the conditions prescribed by the Tennessee statute. It will be observed that the crime it contemplates is one which has been "committed in another state," and is of such character as will render its perpetrator "liable by the Constitution and laws of the United States to be delivered over upon the demand of the Governor" of the other state, and the perpetrator in contemplation is a person "found in this state charged" with such a crime. This denotes a status, a condition, of the person so found; i. e., a person already charged with the crime at the place of its commission. Further, the sworn complaint upon which a justice of the peace may rightfully issue a warrant of arrest must set forth not only the offense, but "such other matters as are necessary to bring the case within the provisions of law." Let us see whether the offense and other essential matters were set forth in this warrant. It is not shown whether the warrant either included or was accompanied by the oath on which it was issued. If the warrant is considered apart from the oath, nothing is found to indicate either the nature of the offense or the place of its commission, which would render Harris liable to be delivered over upon demand of the Governor of another state as a "fugitive from justice" or otherwise. If, on the other hand, the oath is to be treated as part of the warrant, it is there stated that Manuel Harris had unlawfully entered Shelby county,. Tenn., "a fugitive from justice from the state of Mississippi, where he is charged with the crime of murder"; but the oath does not state how or under what, if any, competent official sanction Harris was so charged in Mississippi, nor can it be presumed, in view of the testimony concerning the sheriff's letter already alluded to, that any showing of the official character mentioned was made before the magistrate. Certainly the statute does not in terms sanction such an omission as this; on the contrary, according to the very terms of the statute, it would seem that such a showing was a matter "necessary to bring the case within the provisions of law." This statute does not purport to invest a justice of the peace with power to issue a warrant upon evidence of a character different from that prescribed by the federal act (section 5278, Rev. Stat. [Comp. St. 1916, § 10126]), and that act requires production of an authenticated "copy of an indictment found or affidavit made before a magistrate" of the state from which the person so charged is alleged to have fled. This evidential feature is fairly embraced within the meaning and intent of the Tennessee statute, since comparison of that statute with section 5278 and the second paragraph, § 2, art. 4, of the federal Constitution, shows that the state provisions.

were designed consistently to aid those of the federal Constitution and statute on the subject of fugitives from justice as between the states and territories.[3]

[1, 2] What, then, was the effect of the omission either to state in the oath (and we may treat the oath as the statutory complaint required) or otherwise to show under what if any. competent official action Harris was charged in Mississippi with having there committed the crime of murder? In proceedings looking to the rendition from one state to another of persons charged with crime, courts will not indulge in technical tests of the sufficiency of a charge where it substantially describes the crime (Pierce v. Creecy, 210 U. S. 387, 401, 28 Sup. Ct. 714, 52 L. Ed. 1113; and see Matter of Strauss, 197 U. S. 324, 325, 334, 25 Sup. Ct. 535, 49 L. Ed. 774); but the courts must be able to find some appropriate allegation and evidence that a charge has in reality been duly made in the state where the crime is alleged to have been committed. And we understand the rule to be that in a proceeding before a magistrate for the arrest of the person so charged, brought in the state to which he is alleged to have fled, it must appear by admissible proof that in the state where the crime was committed he stands charged through indictment or affidavit before a magistrate or by some other equivalent accusation sanctioned by the laws of that state. State v. Hufford, 28 Iowa, 391, 394, 396; Malcolmson v. Scott, 56 Mich. 459, 461, 466, 23 N. W. 166, opinion by Justice Campbell; Forbes v. Hicks, 27 Neb. 111, 116, 42 N. W. 898 (the state statutes involved in the foregoing cases were similar to the Tennessee statute in question here); People ex rel. Lawrence v. Brady, 56 N. Y. 182, 186, 187; Matter v. Heyward, 1 Sand. (N. Y.) 701, 707; Matter of Leland, 7 Abb. Prac. N. S. (N. Y.) 64, 66; Ex parte A. W. McKean, 3 Hughes, 23, 25, Fed. Cas. No. 8,848; Ex parte Morgan (D. C.) 20 Fed. 298, 308; Ex parte Cubreth, 49 Cal. 435, 437; Ex parte Lorraine, 16 Nev. 63. And it has in effect been held that such evidential showing was necessary, even in the absence of a statute, say like that of Tennessee. In Matter of Washburn, 4 Johns. Ch. (N. Y.) 106, 114, 8 Am. Dec. 548; Matter of Fetter, 23 N. J. Law, 311, 320, 57

---

[3] It is not suggested that the state legislation is violative of the federal Constitution or statute upon this subject. In spite of conflict in decisions of an early period touching the power of a state to enact legislation of an auxiliary character on that subject (2 Moore on Extradition, § 542, and citations), it is safe to say that such legislation is not now open to objection. Burton v. New York Cent. R. R. Co., 245 U. S. 315, 318, 38 Sup. Ct. 108, 62 L. Ed. 314; Matter of Strauss, 197 U. S. 324, 330, 25 Sup. Ct. 535, 49 L. Ed. 774 et seq.; Commonwealth v. Tracy, 5 Metc. (Mass.) 536, 549, 550, 49 Am. Rep. 63, Chief Justice Shaw announcing opinion; Ex parte Ammons, 34 Ohio St. 518, 519; Robinson v. Flanders, 29 Ind. 10, 14; In re Mohr, 73 Ala. 503, 510; Kurtz v. State of Florida, 22 Fla. 36, 42, 1 Am. St. Rep. 173; Dennison v. Christian, 72 Neb. 703, 707. 101 N. W. 1045, 117 Am. St. Rep. 817, affirmed without opinion 196 U. S. 637. 25 Sup. Ct. 795, 49 L. Ed. 630. These decisions do not differ in principle from the recent ruling in Stellwagen v. Clum, 245 U. S. 605, 613, 614, 38 Sup. Ct. 215, 62 L. Ed. 507, to the effect that state statutes intended to avoid certain classes of conveyances and so to promote the equal distribution of insolvents' estates although leading to different results in different states, were not inconsistent with the power of Congress to establish uniform laws on the subject of bankruptcy.

Am. Dec. 382; State v. Anderson (S. C.) 1 Hill, 330. Nor can such a showing be excused upon counsel's theory that the time required to secure a proper warrant would enable the fugitive to escape arrest by passing "from state to state in immunity, while those who pursued him sought to get warrants." This is to ignore the declared legislative policy of Tennessee; it is to assert a degree of license in the matter of arrests which would open the law to serious abuse and render it an instrument of oppression; these statutory provisions were framed with reference, not alone to actual fugitives, but also to the rights, the individual liberty and security, of innocent persons as well. Upon this subject Justice Campbell said in Malcolmson v. Scott, supra, 56 Mich. 465, 23 N. W. 168: "Fundamental rules of constitutional immunity cannot be relaxed."

[3] It should be constantly borne in mind that the statute of Tennessee does not purport to deal with domestic crimes; it concerns crimes committed in other states, and provides only for the arrest of persons who are there charged with the commission of such crimes and subsequently found in Tennessee. This distinguishes the instant case from that of Burton v. New York Cent. R. R. Co., supra, 245 U. S. 315, 38 Sup. Ct. 108, 62 L. Ed. 314; and the distinction derives emphasis from Tarvers v. State, 90 Tenn. 485, 499, 16 S. W. 1041, opinion by the late Mr. Justice Lurton. It must follow that the magistrate was without jurisdiction to issue the warrant for the arrest of Manuel Harris as a fugitive from justice, and that, whether the warrant be treated as including the oath or not, it was not fair and regular on its face, and was void.

[4] 2. We may now recur to the special defenses set up in the pleas of the deputy sheriffs and the constable in justification of their conduct toward Mathew Harris. The theory of those defenses, as we interpret them, is that the officers rightfully entered the premises of Mathew Harris in virtue of the warrant for the arrest of Manuel Harris, and that while engaged in the execution of that warrant Mathew Harris resisted and fired upon them, and so committed a felony in their presence which justified his arrest and all the acts he complains of. It may be conceded that if the warrant had been valid, and there was in fact reasonable ground for believing that Manuel Harris was in the residence of Mathew Harris, Lee and Linson would have been entitled, upon demand and notice of their object, to enter the residence for the purpose of arresting Manuel, and to resort to such force as was necessary to ascertain whether he was in fact there and to effect his arrest;[4] but the rule is that a void warrant, certainly where it is not fair and regular on its face, affords an officer no protection, since he is chargeable with knowledge of its defects. Malcolmson v. Scott, supra, 56 Mich. 464, 23 N. W. 166; Sanford v.

4 McCaslin v. McCord, 116 Tenn. 690, 707, 708, 94 S. W. 79, 8 Ann. Cas. 245, and citations; Commonwealth v. Reynolds, 120 Mass. 190, 196, 21 Am. Rep. 510; State v. Smith, 1 N. H. 346; Semayne's Case, 3 Coke, 185, 186, par. 3; Harvey v. Harvey, 26 Ch. D. 644, 649, 650; 16 L. R. A. 500 to 504, note. See, also, sections 6999, 7000, Shannon's Tenn. Code (Ed. 1917); and Id. (Ed. 1896), giving to officers the right to enter dwellings in the execution of process concerning arrests for the commission of exclusively Tennessee offenses.

Nichols, 13 Mass. 286, 287, 288, 7 Am. Dec. 151; Piper v. Pierson, 2 Gray (Mass.) 120, 122, 61 Am. Dec. 438; Lueck v. Heisler, 87 Wis. 644, 647, 58 N. W. 1101; Heller v. Clark, 121 Wis. 71, 76, 98 N. W. 952; Vinton v. Weaver & Veazie, 41 Me. 430, 431; Elsemore v. Longfellow, 76 Me. 128, 131; Casselini v. Booth, 77 Vt. 255, 257, 59 Atl. 833; Hussey v. Davis, 58 N. H. 317; Allen v. Gray, 11 Conn. 95, 102; Jordan v. Henry, 22 Minn. 245, 246; Gorton v. Frizzell, 20 Ill. 292, 295; Stephens v. Wilkens, 6 Pa. 260, 262; Poteete v. State, 9 Baxt. (68 Tenn.) 261, 265, 40 Am. Rep. 90. Lee, for example, was bound to know that the law did not invest the magistrate with power to issue a warrant for the arrest of Manuel Harris as a fugitive from justice in the absence of appropriate showing that he stood charged in Mississippi with the crime mentioned by Lee in his oath. Thus Lee and also Linson attempted, not merely to execute a void warrant, but in legal effect acted without a warrant, and in either view were trespassers. Commonwealth v. Crotty, 10 Allen (Mass.) 403, 405, 87 Am. Dec. 669, and citations, approved in West v. Cabell, 153 U. S. 78, 86, 14 Sup. Ct. 752, 38 L. Ed. 643; Commonwealth v. Martin, 105 Mass. 178, 181; Tackett v. State, 3 Yerg. (11 Tenn.) 392, 394, 24 Am. Dec. 582; and see State v. Mann, 27 N. C. 45, 47. The attempt, then, to justify entering the residence, or even the premises, of Mathew Harris in virtue of the warrant of arrest must fail.

In support of the pleas, however, counsel take the further position that Isiah Griffin without just cause fired at Linson, that this was the commission of a felony in the presence of the officers, and that for the commission of this offense Lee was entitled to enter the house for the purpose of arresting the offender at the time Mathew Harris fired upon him. This seems at last to be claimed as the real justification for Lee's entry into the residence of Mathew Harris. We thus reach several disputed questions of fact, and upon their solution must depend whether either Isiah Griffin or Mathew Harris in reality committed a crime. To illustrate: Did Isiah fire upon Linson at all? If so, were the conditions such as reasonably to create in him a belief that he was in imminent danger of death or of great bodily harm, and thus to justify him in resorting, if in fact he did resort, to extreme measures in self-defense? If such conditions did not exist, if in truth he fired upon Linson in circumstances not reasonably calling for the use of a deadly weapon, it well may be that he committed an offense in the presence of an officer, for which Lee was entitled, upon notice of his official character and purpose, to enter the residence to arrest the offender (Shannon's Code [Ed. 1917] §§ 6997-6999), for we are now dealing with an alleged Tennessee offense exclusively.

[5] Further, if Lee's entry into the house was without justification, still Mathew Harris was not for that reason alone entitled either to kill him or use a deadly weapon to repel him. Although a person may with reasonable force resist an officer attempting unlawfully to arrest him, yet his resistance must be proportioned to the danger threatened. A person has no right to kill an officer seeking to make an unlawful arrest, unless the circumstances lead him fairly and honestly to believe that he is in imminent peril of death or of great bodily harm; he

may not resist with a deadly weapon in the absence of well-founded reason to apprehend greater injury than the unlawful arrest. James Galvin v. State, 6 Cold. (46 Tenn.) 283, 291, 292; Williams v. State, 44 Ala. 41, 43, 45; Stockton v. State, 25 Tex. 772, 776; Briggs v. Commonwealth, 82 Va. 554, 564; Creighton v. Commonwealth, 84 Ky. 103, 104, 4 Am. St. Rep. 193; State v. Underwood, 75 Mo. 230, 238; State v. Row, 81 Iowa, 138, 150, 46 N. W. 872; State v. Spaulding, 34 Minn. 361, 366, 25 N. W. 793; Brooks v. Commonwealth, 61 Pa. 352, 357, 100 Am. Dec. 645; People v. Carlton, 115 N. Y. 618, 623, 624, 22 N. E. 257; State v. Scheele, 57 Conn. 307, 313, 315, 18 Atl. 256, 14 Am. St. Rep. 106; State v. Ward, 5 Har. (Del.) 496, 500. The question of entrance into a home for making an arrest without a warrant, it is true, did not arise in these decisions; but, in view of the statutes of Tennessee last cited, we regard the ruling principles of those cases as applicable here as tests of whether the use of firearms was justified. The same principles have been applied, and with much force, where entrance into the dwelling had been made, not by officers, but by mere intruders. Pond v. People, 8 Mich. 149, 176; State v. Middleham, 62 Iowa, 150, 155, 17 N. W. 446, and citations; and, by analogy, Hull v. State, 74 Tenn. 249, 261; Johnson v. State, 100 Tenn. 254, 261, 45 S. W. 436; Beard v. United States, 158 U. S. 550, 564, 15 Sup. Ct. 962, 39 L. Ed. 1086.

In thus pointing out principles of law that will be applicable or not according as the facts are ultimately found, it is by no means intended to intimate whether Mathew Harris did or did not commit the felony charged against him. The case is one of its own kind as respects Mathew Harris. According to the testimony of Linson himself, when the back door of the house was opened and the two men were coming out, one as he says with a pistol and the other with a Winchester rifle, he warned them to "get back in there before I kill you," and admittedly fired at Griffin, although saying that Griffin fired first. Clearly the men so warned were Mathew Harris and Griffin. Since Lee and Linson were at the house without a valid warrant, it is certain that Mathew Harris was not obliged, in obedience to Linson's warning, to retreat into the house (Beard v. United States, supra, 158 U. S. 564, 15 Sup. Ct. 962, 39 L. Ed. 1086; Pond v. People, supra, 8 Mich. 176); yet he did retreat, and only to find Lee entering the house from the front door, with Mathew's wife walking immediately in front of him. Surely Mathew was not bound to retreat again; but even considering the warning, and the firing that had already taken place, it cannot be concluded as matter of law that Mathew rightfully sought to repel Lee's entrance and approach by firing his rifle. This situation, like that of Griffin's alleged firing, presents questions of fact; and we do not see how such questions can be answered by a court. As Mr. Justice Peckham said in reversing and remanding the case of John Bad Elk v. United States, 177 U. S. 529, 532, 20 Sup. Ct. 729, 44 L. Ed. 874, and when speaking of the rights of the defendant who had resisted and killed an officer attempting unlawfully to arrest him without a warrant (177 U. S. 537, 20 Sup. Ct. 732, 44 L. Ed. 874):

" * * * The law looks with very different eyes upon the transaction, when the officer had the right to make the arrest, from what it does if the

officer had no such right. What might be murder in the first case might be nothing more than manslaughter in the other, or the facts might show that no offense had been committed."

Again, in Pond v. People, supra, where the facts were exceptionally calculated to provoke the use of a deadly weapon against trespassers, Justice Campbell said (8 Mich. 182):

"It is claimed * * * that we are authorized to pronounce upon the case the judgment which the facts warrant. Had the facts spread out in the bill of exceptions been found as a special verdict by the jury, this would be true. But, as the case stands, we can only consider them as bearing upon the instructions given or refused." [5]

[6] And it scarcely need be added that upon the motion in the instant case to instruct the jury that the defendants were liable, the court was required to take that view of the evidence which was most favorable to them. It was therefore error to grant this motion.

3. The deputies and the constable in another plea, as already pointed out, alleged the arrest of Mathew Harris under a warrant accusing him of the "offense of assault to murder" and issued some three days after the events of the night of October 26th at his residence. The warrant was issued and directed to "any lawful officer of the state" by a justice of the peace, October 29th; this was done upon the oath of defendant Lee, and the return made thereunder showing execution of the warrant was signed in the name of defendant Reichman, sheriff, by defendant Linson, his deputy. The return, however, bears date October 26th—an obvious error. The offense charged in this warrant is the one claimed to have been committed by Harris when firing upon Lee at the residence on the night of October 26th, and the warrant seemingly resulted in the indictment, conviction, and ultimate acquittal of Harris. Apart from the relation of Sheriff Reichman to the return made under this warrant and the effect it may have upon his liability, it is not necessary to notice the plea setting up this arrest; for, although defendants made the arrest the subject of a special request which was refused and exception reserved, no assignment was made in that behalf.

4. As to Sheriff Reichman, who was not in fact present at the Harris residence, two questions arise. One is whether he is liable at all, and the other whether he is liable jointly with the deputies and the constable.

(a) The first of these questions leads to an inquiry into the capacity in which the deputies acted. The testimony of the deputies is that they

[5] The facts and the occasion for this expression of the law are plainly distinguishable from the situation confronting Justice Carpenter in Cook v. Hastings, 150 Mich. 289, 291, 114 N. W. 71, 14 L. R. A. (N. S.) 1123, 13 Ann. Cas. 194, where it was said: "The trial court should have directed a verdict against defendant Hastings." In the instant case the question of right to enter the residence of Mathew Harris for the purpose of making an arrest depended upon whether Griffin had in fact committed a felony in the presence of the officers; and while in Cook v. Hastings the right to make an arrest for the commission of an offense in the presence of an officer is distinctly recognized yet no claim was there made that any offense had been so committed. See 150 Mich. 290, 114 N. W. 71, 14 L. R. A. (N. S.) 1123, 13 Ann. Cas. 194.

were all at the residence of Mathew Harris during more or less of the night in question, and that they acted throughout as deputy sheriffs. This in substance is reiterated in their pleas. Further, the warrant procured three days later for the formal arrest of Mathew Harris, and in apparent furtherance of the previous acts of the deputy sheriffs, shows as we have seen that it was executed in the name of Sheriff Reichman. The sheriff has not repudiated this official use of his name, nor has he offered any testimony disputing that of his deputies. It results that the acts done in effecting the arrest of Mathew Harris for his alleged felony must for the purposes of this decision be treated as official acts.

[7] The rule of law applicable to such a situation is settled. Where the act of the deputy is an official act and causes an injury, the sheriff is answerable; and this is true where the act is done in execution of the deputy's office, even though he may be mistaken as to the lawfulness of the act, for otherwise. no action could ever be maintained against a sheriff for the misconduct of his deputy. Knowlton v. Bartlett, 1 Pick. (Mass.) 270, 273; Waterbury v. Westervelt, 9 N. Y. 598, 603; Morgan v. Chester, 4 Conn. 387, 388; Woodgate v. Knatchbull, 2 T. R. 148, 155, 156; Spencer v. Moore, 19 N. C. 264, 265; King v. Brown, 100 Tex. 109, 112, 94 S. W. 328; 1 Cooley on Torts (3d Ed.) pp. 222, 223; and see Jones v. Van Bever, 164 Ky. 80, 97, 174 S. W. 795, L. R. A. 1915E, 172. Although the sureties of the sheriff are not parties here, yet the controlling principles laid down in these cases and by Judge Cooley are necessarily involved and applied in decisions granting recovery against a sheriff or other like officer and his sureties for misconduct of the officer or his deputies. Lammon v. Feusier, 111 U. S. 17, 20, 4 Sup. Ct. 286, 28 L. Ed. 337 et seq.; National Bank of Redemption v. Rutledge (C. C.) 84 Fed. 400, 402, et seq., by Hammond, J.; Johnson v. Williams, Admr., 111 Ky. 289, 295, 63 S. W. 759, 54 L. R. A. 220, 98 Am. St. Rep. 416; Brown v. Weaver, 76 Miss. 7, 19, 20, 23 South. 388, 42 L. R. A. 423, 71 Am. St. Rep. 512, and citations; State v. Boepple (Mo. App.) 198 S. W. 502, 503. And see Bernard v. Bowe (C. C.) 41 Fed. 30, 31 (D. C., per Wallace, J.). We do not overlook McLendon v. State, 92 Tenn. 521, 22 S. W. 200, 21 L. R. A. 738; we think the facts of the instant case distinguish it from the decision in that case. There the sheriff acted under an order "void on its face," and was "presumed to have known the law" (92 Tenn. 525, 22 S. W. 200, 21 L. R. A. 738); while here both Reichman and his deputies treat the acts of the latter as justified because of the felony they allege to have been committed by Mathew Harris in the presence of the deputies, and upon this hypothesis the statute is relied on as in effect standing in the place of process in the sense that in such instances it authorizes arrest to be made without a warrant.

[8] (b) Upon the question whether Reichman is liable jointly with the deputies and the constable, counsel urge, in the first place, that Reichman can be held only in case his deputies were acting in their official capacities, and that in this event the deputies are not liable, except to their principal; and, next, that if the deputies were acting

personally, Reichman is not answerable for their acts. Thus it is argued that there is no way in which the sheriff and his deputies can be held jointly in this case. This does not question the right to join the constable with the sheriff. If we are right in the view already expressed that upon the present record the deputies must be treated as having acted officially, it is not necessary to consider the question of joinder on the theory that their acts were personal. We are not convinced that the official character of the acts prevents the joinder. It is true that, if a settled rule of judicial decision prevailed in Tennessee forbidding joinder in such circumstances, we should be bound by it (Robbins v. Pennsylvania Co., 245 Fed. 435, 437, 157 C. C. A. 597 [C. C. A. 6]); but we have not been referred to any decision in that state which lays down such a rule. However, it is said that a rule to this effect is deducible from certain of the decisions. For example, Rose v. Lane, 3 Humph. (Tenn.) 218, decides that a deputy sheriff, whose duty was simply to execute process, could be held personally liable for acts done "beyond the obligations of his office" (219); and this was the question for decision. The deputy had undertaken in the owner's behalf to collect certain notes and accounts and had neglected to do so. The sheriff was not a party to the suit. Though in the opinion it was stated arguendo that the deputy was not liable for his official acts except to his principal, the statement was not necessary to the decision and was referred to in Vance v. Campbell, 8 Humph. (Tenn.) 524, 527 as having been made "incidentally." Moreover, Vance v. Campbell and also Robertson v. Lassan & Dugan, 7 Cold. (Tenn.) 159, 161, were statutory proceedings of a summary character against deputy sheriffs; recovery was allowed in the former and denied in the latter according to the provisions of the respective statutes. Although the statement in Rose v. Lane is reiterated in the Robertson Case, yet the statute itself distinctly controlled the proceeding; summary action can scarcely furnish a guide for general procedure. In State ex rel. v. Slagle, 115 Tenn. 336, 338, 339, 89 S. W. 326, the statement of Rose v. Lane again finds expression; but there the sole question was whether the offices of deputy sheriff and constable were incompatible in the sense that the same man could not hold both. It therefore cannot be safely said that there is any established rule of decision in Tennessee to which the joint action under review is opposed.

It is also contended that the rule so claimed against joinder is deducible from certain statutes of Tennessee. It is pointed out, for instance, that the sheriff is required by statute to give an official bond, and is authorized to have as many regular deputies as he may desire (Thompson's Shannon's Code, §§ 443, 448); but that there is no provision exacting bonds of deputies. Attention is called in the next place to the statute which provides that, where judgment is rendered against the sheriff for the "default" of his deputy, he may recover judgment summarily on motion against the deputy. Id. § 5370, par. 2. Counsel for plaintiff claim that this provision is to be read in connection with section 5359. This section authorizes judgment with 12½ per cent. damages to be taken on motion against a sheriff for making improper return upon an execution directed to him or failure to pay over money

252 F.—25

collected thereon; but it is said that since the enactment of the Code in 1858 no such judgment could be taken against the deputy, and this appears to be correct. Id. note 2, p. 2214. It would therefore seem that these statutory provisions relate only to summary proceedings, first, by an execution creditor against the sheriff; and, second, by the sheriff against any of his deputies whose "default" has resulted in a judgment against his principal. Whether this is a true interpretation of these statutes or not, it is certain that they do not in terms relate to a case like the one at bar; they make no provision for a case where either the sheriff and his deputies together, or his deputies alone, participate in the commission of positive acts, such as the infliction of personal injuries upon a third person, or trespass upon his property, in the execution of a duty and power reposed in the sheriff and the deputies alike. If, for instance, the sheriff had been present and taken part in committing the injuries inflicted upon Harris at his residence, it is hard to believe—indeed, it is not claimed—that in the absence of justifying circumstances the sheriff and his deputies could have escaped joint liability for the injuries so committed. This we think is equally true as respects such positive acts of the deputies in the absence of their principal, since the sheriff in contemplation of law is always present with his deputies in the execution of their offices. As Judge Cooley said in his work on Torts (volume 1 [3d Ed.] p. 223):

"The fact that the sheriff is responsible does not relieve the deputy, who is equally liable with the sheriff for all his positive misfeasances."

Again (page 228):

"It was once held in Massachusetts that a sheriff who was not present when his deputy, in the service of a writ, committed a trespass, could not be held liable as a joint trespasser with him; but the better doctrine is, that the sheriff, by construction of law, is always present with the deputy who bears his process, and is legally responsible for his acts."

In Waterbury v. Westervelt, supra, 9 N. Y. 598, 603, Judge Denio said:

"It is an elementary principle that in torts he who procures a command is equally liable with him who does the act, and they may all be sued jointly or severally at the election of the plaintiff. The deputy in this case is made liable, not from any official relation to the matter, but because he has voluntarily invaded the plaintiff's right of property; the sheriff is made liable, because in law he is considered as having commanded the act to be done. The existence of such command is established, by showing the relation between them."

See King v. Orser, 4 Duer (N. Y.) 431, 437, 438, by Judge Duer; Hoye v. Raymond, 25 Kan. 665, 666; Morgan v. Chester, supra, 4 Conn. 387, 388; Balme v. Hutton, 9 Bing. 471, 473, 474; Southern Bell Telephone Co. v. Francis, 109 Ala. 224, 233, 19 South. 1, 31 L. R. A. 193, 55 Am. St. Rep. 930; Remlinger v. Weyker, 22 Wis. 366; Pond v. Leman, 45 Barb. (N. Y.) 152, 154, and citations; Crocker on Sheriffs (3d Ed.) p. 18. We are not unmindful of the fact, pointed out by Judge Cooley, that a contrary doctrine prevails in Massachusetts (Campbell v. Phelps, 1 Pick [Mass.] 62, 11 Am. Dec. 139, approved in Parsons v. Winchell, 5 Cush. [Mass.] 592, 594, 52 Am. Dec. 745);

but we agree with the view expressed by Judge Denio, who, in Waterbury v. Westervelt, supra, 9 N. Y. 604, concluded that the dissenting opinion of Justice Wilde in Campbell v. Phelps was "more consistent with legal analogies than the one which prevailed."

Differences exist between counsel upon a subject kindred in principle to that of the ruling decisions just cited; it is ratification. We need not allude to the maxim that ratification is the equivalent of a prior command, nor to its analogy in principle to the rule applicable to sheriffs, since the question does not arise under the assignments. Few, if any, of the states provide a more liberal system of procedure than that of Tennessee, and, we are convinced that the question of full redress against all the defendants should be determined in a joint action.

5. It is insisted for Harris, as we have seen, that the officers, including the constable, so far abused any legal authority they may have possessed as to condemn them as trespassers ab initio; and it is urged on behalf of Bradley and Williams, deputy sheriffs, and also McConnell, constable, that they were called to the aid of Lee and Linson with good cause to believe that the felony charged had been committed in the presence of the officers. Since the judgment will have to be reversed, and the cause remanded, it is not necessary to discuss these questions; they may arise under different facts and require different treatment at the next trial.

6. Upon the assignment for refusal to instruct the jury as requested on the subject of punitive damages respecting the acts of the defendants other than Reichman (against whom such recovery was denied), we think it enough presently to say that the rights of the parties are ruled by Beckwith v. Bean, 98 U. S. 266, 25 L. Ed. 124.

[9] 7. A question of jurisdiction was presented in the court below, which we have purposely refrained from noticing at an earlier stage of the opinion. The basis of jurisdiction is alleged diversity of citizenship; the plaintiff averring that he is a resident citizen of Tunica county, Miss., and the defendants resident citizens of Shelby county, Tenn. This was met by plea in abatement, alleging that at the time suit was commenced, as well as at the date of filing the plea, Mathew Harris was a citizen and resident of Tennessee, and that the defendants were then citizens and residents of the same state. On motion it was ordered that the issues raised by the plea be heard and determined at the trial of the case upon the merits, and that meanwhile the defendants file their pleas to the merits. This order was carried out. Testimony was offered on both sides, and the jury specially found that plaintiff "is and was a resident of the state of Mississippi at the date of bringing this suit." We do not discover any error that would justify disturbance of this finding. It may fairly be inferred from the testimony and the instructions of the court, that the jury meant to find that plaintiff was both a citizen and resident of the state of Mississippi. This view was not questioned until the case reached this court. The finding was sufficient to vest the court with jurisdiction. Sun Printing and Publishing Ass'n v. Edwards, 194 U. S. 377, 383, 24 Sup. Ct. 696, 48 L. Ed. 1027; Mahoning Valley Ry. Co. v. O'Hara,

196 Fed. 945, 948, 116 C. C. A. 495 (C. C. A. 6); La Belle Box Co. v. Stricklin, 218 Fed. 529, 534, 134 C. C. A. 257 (C. C. A. 6). The fact of citizenship can, of course, be tested at the next trial. Submission of the issue to the jury was within the discretion of the court. Gilbert v. Davis, 235 U. S. 561, 568, 35 Sup. Ct. 164, 59 L. Ed. 360.

It can serve no useful purpose to pursue the assignments further, since enough has been said to indicate the views of this court upon the controlling questions. The judgment will be reversed, and the cause remanded for a new trial, because of the instruction that the verdict should be one of liability against the defendants who are prosecuting the two writs of error, and an order will be entered accordingly.

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes