NATIONAL BANK OF REDEMPTION v. RUTLEDGE et al.

(Circuit Court, N. D. Ohio, W. D.    August 31, 1897.)

1 JURISDICTION OF FEDERAL COURT—SUIT ON OFFICIAL BOND OF COUNTY OF-
     FICER.
        Federal courts may have jurisdiction of suits on the official bonds of state
     and county officers.

2. COUNTY AUDITOR—PURPOSE OF BOND.
        The bond of a county auditor is not given simply to protect the funds and
     people of his county from loss by reason of his failure to faithfully discharge
     the duties of his office, but as well to protect the whole world from injury
     resulting from his abuse of his official position.

3. OFFICIAL ACT—LIABILITY OF SURETIES.
        Any act which, if done genuinely and honestly by an officer would be an
     official act, is, if done dishonestly and fraudulently, an act done by virtue of
     his office, and the sureties on his bond conditioned for the "faithful dis-
     charge of the duties of his office" are liable for injuries resulting therefrom.

4. COUNTY AUDITOR—FRAUDULENT ISSUE OF BONDS.
        A county officer who is authorized by law to issue genuine bonds by affix-
     ing his signature and seal thereto, if he affixes that signature and seal to
     fraudulent bonds, it is an official act, for which he and his sureties are liable.

This is an action against the defendant and the sureties on his
official bond as the auditor of Hardin county, Ohio, by which they
bind themselves that he "shall faithfully discharge the duties of his
said office" during the term thereof.

The petition alleges that, in violation of the law and the obligation of the
bond, the defendant fraudulently signed and issued $10,000 of false and duplicate
"ditch bonds," purporting to be authorized, ordered, and issued by the commis-
sioners of the county.   The bonds are dated July 1, 1891; part of them payable
July 1, 1897, and a part July 1, 1898; all bearing 6 per cent. interest, semi-
annually, with coupons attached, due April and October 1st of each year.    The
petition further states that the commissioners, as allowed by law, had authorized
the issuance of $30,500 of "ditch bonds," which were ordered to be sold, and were
sold to one Lewis; that the defendant conspired with Lewis to duplicate the
issue with fraudulent bonds, which was done,—$10,000 of them, bearing the num-
bers named in the petition, coming into the hands of the plaintiff in due course
of trade, for value, without notice of the false and fraudulent character attached
to them.   The county refused to recognize and pay this overissue of bonds, and
now this petition alleges as a breach of the official bond the wrongful acts above
stated.     The demurrer presents two questions: First, the jurisdiction of the
court is denied; and, secondly, it is alleged that the petition on its face shows no
cause of action against the sureties.

Leedom & Lewis and Doyle & Lewis, for plaintiff.
West & West and John H. Smick, for defendants.

HAMMOND, J. (after stating the facts).    There is no objection
taken to the jurisdiction of the court except the anomalous one pre-
sented in the argument that the federal courts can have no jurisdic-
tion of suits on the official bonds of state officers because the exercise
of such a jurisdiction would interfere with and compromise the inde-
pendence of state government in its local operations.   No authority
of any adjudication, text writer, or commentator, is cited or suggested
for this position, and I feel free to say that it is one which, in my ex-
perience, I have never heard suggested in the states south of the
Ohio river, or elsewhere, and it therefore seems to me a novel sugges-

tion of very distinguished counsel, coming from that section of the country which, historically, has not been given to exaggerated notions of states' rights. The argument in favor of this position is based upon the statement that counsel has found in the books no cases upon the bonds of state officers, except some in the District of Columbia, where the government of Virginia brought suit upon official bonds given to the state, and one in Nebraska, where a suit was brought by the party injured upon the official bond of an officer who had fraudulently issued county warrants. Virginia v. Evans, Fed. Cas. No. 16,969, 1 Cranch, C. C. 581; Virginia v. Turner, Fed. Cas. No. 16,970, 1 Cranch, C. C. 261; Id., Fed. Cas. No. 16,971, 1 Cranch, C. C. 286; Virginia v. Wise, Fed. Cas. No. 16,972, 1 Cranch, C. C. 142; McConnell v. Simpson, 36 Fed. 750. It is sought in argument to avoid these precedents by suggesting that the defendants had left Virginia, and were found in the District of Columbia, and it was a matter of necessity that the government should sue them there. It is more probable that the defendants resided in that portion of Virginia which was cut off to make the District of Columbia, and were, therefore, sued in that place. And as to the Nebraska case it is suggested that the point was not made, and therefore passed sub silentio. No matter what the necessities were, if the jurisdiction did not exist because of an unconstitutional interference by the federal courts with the rights of the states, the suits could not have been brought. The suggestion of a sub silentio precedent is often available to avoid its force, but not always, and particularly when there is no precedent cited for the contrary principle. Nor could they have been brought if the act of congress had not conferred the necessary jurisdiction; and our judiciary acts have never embodied any such exception from the general grant. I have not searched the books for precedents of suits brought in the courts against state officials on their bonds, either where the state is, by its own consent, the nominal party plaintiff for the use of the party who has been injured, or where the plaintiff may bring the suit in his own name by authority of law; but such suits are common in the experience of many lawyers, and are not supposed to be anomalous. It may be suggested, however, in reply to the argument, that, after the original constitution of the United States was offered to the states, a clamor was made against it that it permitted the states to be sued by citizens of other states and aliens in the federal courts, and in order to quiet this clamor the eleventh amendment was proposed and adopted; and if it had been then supposed that suits like this would compromise the independence of the states, the eleventh amendment surely would or should have been made to comprehend it. That was the opportunity of the states to protect themselves against any obnoxious jurisdiction of the federal courts in relation to their own statehood; and, being then engaged in the business of securing such protection, the absence of any direct exclusion of this class of cases is strongly in favor of the jurisdiction.

The other branch of the demurrer raises the ever-present question whether the alleged breach of the bond comes within its stipulations, and presents again the distinction between that which is done by the officer virtute officii and that which is done only colore officii. The

difficulty rests not in understanding the principle that the sureties are liable in the one case, and may not be in the other, but in determining whether the given facts bring the case within the one or the other category. . This is often complicated with the peculiar phraseology of the condition of the particular bond in controversy.    In this case, however, we are not confronted with any limitations written in the condition of the bond, which is simply that the defendant "shall faithfully discharge the duties of his said office during the term for which he has been elected, as aforesaid," under which we are to look only to the statutes of Ohio declaring and defining his duties, in order to determine what they may be.  A pertinent illustration of the above-mentioned distinction is found in the conflict of authority always raging in the books in the case of a sheriff or like officer having in his hands process authorizing him to seize the goods of A., and he seizes the goods of B., and the question is whether the sureties are liable on his official bond.    Early in the history of the question the courts of the state of New York decided that they are not, but subsequently, in the case of People v. Schuyler, 4 N. Y. 173, those cases were overruled, and the law is now established that they are.    There were dissenting opinions, however, in that leading case, the arguments of which are always resorted to, as in this case, whenever the liability of the sureties is denied, one of the counsel here quoting largely from these dissenting opinions.  People v. Schuyler, supra.  In New Jersey this doctrine was vigorously combated and denied upon arguments almost identical with those which have been used in this case.    State v. Conover, 28 N. J. Law, 224.    I have not taken the trouble to count the states pro and con upon this question, because I find that the state of Ohio has distinctly taken the side of the state of New York, and establishes the liability of the sureties in such a case.  Ohio v. Jennings, 4 Ohio St. 418.  In my judgment, the same argument that makes the sheriff's sureties liable in a case like that makes these sureties liable in a case like this.  So far as I can see, the principle is precisely the same; and I do not find in the argument that has been made here any suggestion different from that which is found in the opinions of the judges in New York, New Jersey, and elsewhere, who combat the doctrine of the liability of the sureties.  I have examined every Ohio case that has been cited by counsel on either side,—not more particularly than the rest, but more anxiously, in order to find safe guidance in this never ceasing conflict of opinion,—and I do not find a single case which seems to me to be authority for a denial of the liability of the sureties on the facts we have here.  Take the case, so much relied upon by the defendants, of McGovney v. State, 20 Ohio, 93, where it was held that a bond intended to be drawn in its words so as to secure those interested in the estate of "James" Findley did not accomplish that purpose when erroneously it was written "Joseph" Findley.   In Lang v. Pike, 27 Ohio St. 498, an appeal bond written to secure a judgment against two could not be permitted to operate where the actual judgment was against one.   In State v. Corey, 16 Ohio St. 17, a bond to protect school funds was not allowed to protect general township funds.  And in Myers v. Parker, 6 Ohio St. 501, a bond mentioning the supreme court was not allowed to cover the dis-

trict court exercising the appellate jurisdiction; and so on in all the cases cited by the defendants there is this principle enforced as it is everywhere: that the liability of the sureties is strictissimi juris, and they are never bound beyond the very precise words of their obligation. Neither are the sureties here to be so bound; but the exact words of their obligation are very comprehensive, indeed, while they were very limited in the class of cases which have been cited by counsel. Among the cases cited by the defendants that which is seemingly closest in analogy to this case is Holt v. McLean, 75 N. C. 347, where it was held that the sureties of the register of deeds were not liable for damages arising out of the false and fraudulent issuance of a marriage license. But upon an inspection of that case it will be found that the condition of the bond was confined by express words to the duty of the register "safely to keep the records and books of his office," and the subsequently occurring words, "to faithfully discharge the duties of his office," were held to be limited by that special recital of his duties which comprehended only those of a custodian of the public records. As was remarked by one of the judges in some case that I have examined, but failed to note, the failure here was occasioned by the neglect of the state legislature to provide a sufficiently comprehensive bond to protect the public against all malfeasance in office. The judge remarked that it was open to the state to protect itself by careful attention to this matter of the condition of the bond, and undoubtedly the laws of Ohio fixing the condition of the bond we have before us were made with special reference to this duty of protecting the public by making a comprehensive bond.

I neglected just above to notice the much-cited case of State v. Medary, 17 Ohio, 554, where it was held that a bond did not cover an office not named in it, although most intimately allied to it both in the character of the duties to be performed and in every other respect; but the distinction there was a very plain one. The bond was to cover the duties of a member of a particular board, who had all the duties to perform that devolved upon any member of the board; but in the practical operations of the business from among its own members the board selected a "commissioner of the board," who was charged with the responsibility for certain moneys; and it was held that a bond to cover the discharge of his duties as a member of the board did not cover those special duties as "a commissioner to that board"; and the case, like the rest, falls within the suggestion that has been made with reference to the numerous list of Ohio cases that have been noticed.

Perhaps I should, from local pride, mention the Tennessee cases that have been cited to me. The case of McLendon v. State, 92 Tenn. 520, 22 S. W. 200, was a suit for malicious prosecution for a wrongful arrest of a person by the sheriff, and, inasmuch as the sheriff had no process in his hands for the arrest of this citizen, it was held that it was not made ex virtute officii, but only colore officii. In the case of Turner v. Collier, 4 Heisk. 89, where an officer falsely represented himself to have process, and did not, it was held that his sureties were not liable. It will thus be seen that perhaps Tennessee has aligned itself with the states that oppose the doctrine of People v. Schuyler,

supra, on this point; but the state of Ohio, as I have already shown, has aligned itself the other way.

I may here notice the case of Ware v. Brown, 2 Bond, 267, Fed. Cas. No. 17,170, where a notary public falsely and fraudulently certified that a joint owner had signed and acknowledged before him a deed, when he had not done so. It was not a suit against his sureties, —if he had any sureties,—and they are not mentioned. The suit failed because brought by a remote vendee, but the language of Judge Leavitt is quite applicable here:

"The fraud and malfeasance of the defendant, if the facts averred in the declaration are true, show a most repulsive official corruption on the part of the defendant; and if this action were prosecuted by Buffington, who was the person so defrauded by the acts of the defendant in his official character as notary public, there would be no question that it would be sustained, and that he could recover to the extent of any loss or injury he may have suffered."

Does any one suppose that, if the notary public had given a bond to faithfully discharge the duties of his office as notary public, and the sureties had been sued, it could have been held that this was a bare individual liability of the notary public, and not one attaching to him in his official capacity, for which his sureties would be liable? It may be claimed that that case exhibits a more directly official act than the one we have in hand, but I doubt it.

The case of State v. Sloane, 20 Ohio, 327, has been especially commented upon in argument by counsel, for one reason,—because the opinion is by that eminent judge, Mr. Justice Ranney. He says that the sureties were not liable in that case, "especially under the doctrine constantly applied in this court, and reiterated again at this term, that the undertaking of sureties is to receive a strict construction, and not to be extended by implication to cases not falling within the terms of the contract into which they have entered"; which is the undoubted doctrine, well stated, that is to be found governing all courts, whether they proceed upon the lines of the narrowest liability of the sureties, or are disposed to be more liberal in the interest of the public. Everybody agrees to that doctrine. In that case the court of probate had appointed a guardian, and the law required that before he could enter upon the duties of his trust he should give a bond, which he did not do. There had grown up a habit in the office of the clerk of issuing to guardians what were called "letters of guardianship." The law knew of no such letters or authority, resembling letters of administration or letters testamentary, and it was wholly gratuitous on the part of the clerk to issue them. Their only function was as a convenient evidence that the guardian had qualified; but the clerk had no duty to perform in relation to the appointment of guardians except that of keeping the records showing that the court had appointed them, and that they had filed their bonds; and it was held that, under the circumstances, for this gratuitous service the sureties were not liable in damages; and the case is in line with all the other Ohio cases upon that subject. It is precisely like in principle to the North Carolina case above commented on, where the register of deeds issued a false marriage license, which was not within the limitations of his bond, although it was in that case within his authority as an official to issue marriage licenses.

There is a very discriminating opinion in the case of Commonwealth v. Cole, 7 B. Mon. 250, which is cited by the defendants. It was a constable's bond, conditioned "in all other things to faithfully execute and perform the said office of constable according to law." I do not know that a court can find any safer guidance in the application of the particular facts of any case than to follow the indications of this opinion, in which Chief Justice Marshall of Kentucky uses this language:

"Conceding, as we are disposed to do, that this class of conditions should receive the same liberal construction, for the protection of the community against fraud, extortion, and every fraud or oppression incident to an abuse of official character and powers of a constable, still there must be some reasonable limits to its operation. It cannot cover all acts which the individual may do while he holds the office of constable, nor even all acts which, in their nature, pertain to the office, and might, under rightful circumstances, be rightfully done by the constable. The act must not only be of this nature, but it must be at least done by him as constable under claim and right to do the act by virtue of his office. And, so far as it implies acquiescence or co-operation in the party injured, this acquiescence or co-operation should be induced by a confidence in the official character and right as asserted." "It is to be recollected that the question is not how far the constable may be individually responsible for his own acts, but how far his sureties may be responsible for them, as by executing the official bond with him they have not only evinced their confidence in his capacity and other qualifications for the office, but have enabled him to assume the character and rights belonging to it. They may, perhaps, be justly held responsible for such acts within the general range of his powers as (though they had no legal authority in the particular instance) he does in the name and by color of the office and of the rights incident to it; but for acts which, in their nature, are wholly beyond the office, or for acts which, though within the general powers of the office, are neither actually authorized in the particular case nor pretended to be done in virtue of official authority,—that is, for acts done as a private individual, —they cannot be made responsible on the bond."

I desire to call attention particularly to the words "nor pretended to be done in virtue of official authority." This seems to be very important, and a safe guide in close cases as a test of the particular act that was done. If the official in the particular thing done is assuming to act in his official capacity, and he has, by virtue of authority of law governing his duties, the right to do a thing just like and precisely similar to that, and particularly where his function is to certify to the genuineness of the thing which he does, so that people dealing with his office and the things that come from it may with confidence rely upon the genuineness of his signature and seal, and all that, what he does in that behalf is not only done by color of his office, but it is done by virtue of his office; that is to say, he does those things by reason of the authority which the law has conferred upon him to do the like things when they are honestly and genuinely required to be done. It is a pretense, to be sure, in the case of the fraudulent duplicate issue of bonds; but it is none the less the exact counterfeit of that which may be genuine, and it is not a "faithful" discharge of the duties of his office to do the wrongful thing. In the case just cited from Kentucky there is required a very close attention to the facts in that regard to understand the force of those distinctions and their illustrative value in the process by which this case is to be determined, and I shall take time to call particular attention to them. The plaintiff knew that there were judgments against him in the office of the justice of the

peace, which in due course of business would come into the hands of Cole, the constable, for collection. Cole represented to the plaintiff that he had these executions in his hands against him for collection, and without more ado the plaintiff paid him the money. As a matter of fact, Cole did not have the executions in his hands, and the plaintiff had to pay it the second time. The case was decided upon demurrer in the absence of necessary averments of fact in the declaration, and not at all upon any principle that such representations were not covered by the bond, as against the sureties. The intimation is that, if the declaration had contained that which the court so properly points out it did not contain, it would have been good. It was not averred that Cole was constable at the time he made these declarations; but, conceding that this was implied, and also that it was sufficiently implied, on the declaration as it was, that Cole represented that the executions were then in force, yet it did not appear, says the court, even by implication, that any payment was made at the time these representations were made, or that there was any claim by the constable at that time of a right to coerce payment, or that the payments were made by virtue of the executions then in hand, or that the plaintiff had the belief that there was a right then existing on the part of the constable to collect the debt. Neither was it averred in the declaration that the process was not in fact in the hands of Cole at the time the representations were made. For all that appears, the representation may have been at that time true. He may have had executions in his hands. They may have been in full force when he said they were; or he may have received the money after he had made an actual return of the executions, or after they had expired, when he had no right to pretend to coerce collection. And it was not stated that the payments were made to Cole as constable, and, for all that appears in the declaration, they may have been made with full knowledge that he had no right to collect them as constable, and upon his promise to make a proper application of them to the judgments in the magistrate's court. From all this it will be seen that the plaintiff loosely paid money upon representations made at one time which may not have been true at the time he paid the money, the result being that the case was really decided upon an insufficiency of the declaration that the injury was the direct and proximate cause of the false and fraudulent conduct on the part of the constable. There is no intimation in the opinion that the constable's sureties would not have been liable if all the things had been averred in the declaration which the judge says were left out. There is no such defect in this declaration, for it is perfectly plain from the petition that when the fraudulent bonds were issued they were immediately put upon the market, and bought by the plaintiff upon the representations contained upon their face that they had been properly issued and attested by this officer, who was required by law to give them this very sanction of his signature and seal.

This sufficiently represents the character of the cases upon which defendants have relied in this argument, and they seem to me to be clearly inapplicable.

In the case of Cricket v. State, 18 Ohio St. 9, 23, speaking of an auditor's warrant which had been wrongfully issued, the court says:

"The warrant purported to be an official act. It was drawn under color of office, and constituted the means by which the money was drawn from the treasury." Learned counsel seek to avoid the force of this by saying that the sureties undoubtedly would be liable if, this auditor having issued these fraudulent bonds, they had, upon the faith and strength of that which he did, been actually paid by the treasury; but because the treasury discovered the fraud in time, and did not pay the bonds, it is said that the sureties are not liable. Now, why not? The act is just the same whether they were paid or not paid by the treasury, and it is only a question of who was injured; and this argument only amounts to saying that this bond was given for no other purpose than to protect the money actually in the treasury from such a fraud as this. But, even on that theory of protection only for the county and none others, surely the people are just as much interested in protecting their credit as they are in protecting their actual funds. They are just as much interested in protecting themselves from the danger that the fraud will not be discovered in time to withhold payment as they are in protecting the actual money that is in the treasury. The credit of the county is just as much a part of its assets and property as the funds it has on hand. Its protection from danger, although in some instance averted, and from the loss and injury that comes of defending just such suits as this, is sufficient to show that it is a specious and false assumption to say that, the bonds not having been paid by the treasury, the county and the people cannot be taken to have been injured by such a transaction as this. So that, assuming, for the sake of argument, that this position is correct, that this bond was only given to protect the people of the county of Hardin, and not outsiders, and by that test of what constitutes an official act they are injured by this fraudulent transaction, even if they have nothing more to do than to pay the costs of this suit, this brings it within even the rule contended for by counsel that the act must be of that nature which specifically injures the people of the county. But it has been well decided by the supreme court of Ohio itself in Walsh v. Miller, 51 Ohio St. 462, 38 N. E. 381, that these words, "for the faithful performance of all his duties," are, as in other cases of contract, to be interpreted according to the intention of the parties at the time the contract was made, and that this rule of strictissimi juris is not to override the other rule that the words are to be interpreted according to the manifest intention of the parties at the time. And can it be supposed for one moment that it was not within the intention of these parties to protect the county and the world against the fraudulent overissue of bonds by an auditor who has possession of its signature and seal, and the only power to attest their genuineness? Surely not. As before remarked, if such a construction were put upon these words, it would show that the legislature of Ohio did not pay that attention to the protection of the public which manifestly they have by such broad and comprehensive language as they used in this official bond, and not adopting those restrictive words which are found in too many of them. And another suggestion occurs that this rule of strictissimi juris applies rather to the words of the bond

as written and signed by the sureties, and is not to be extended to modify the language of the statute defining the duties in such a way that it would not be modified if no question of suretyship were involved. The construction of the words of the statute must be the same in any event. Under such language as we have in this bond, and under the description in the statutes of the duties that are required of an auditor of the state of Ohio, it seems to me that it is placing an entirely unjustifiable and strained construction upon the language used to confine the obligation to the protection of the people of the county and the taxpayers and the funds in hand in their dealings with the auditor. The public at large, under any well-regulated and intelligent public policy, should be protected in their dealings with the county as much as the county itself in its corporate interest in the business that is done. Whenever the state authorizes a county to issue negotiable bonds, by necessary implication those bonds are to be put upon the market; and it is therefore an invitation to the people everywhere, domestic and foreign, to come to that county, and deal with it, by lending their money to it, upon the faith of its credit, by purchasing its bonds. The officers designated to discharge the duty of issuing and certifying the bonds are put there for the very purpose of protecting not only the people of the county, but the public at large, against any such transactions as those which are alleged in this petition. It may not be too much to say that the office was created for that very purpose in relation to all the duties that devolve upon it in respect of issuing negotiable bonds to be floated on the market; and therefore the argument that has been made that would take this case out of the official duty of the auditor charged with the issuance of negotiable bonds is altogether like the arguments that are made everywhere in favor of the sureties of the sheriff when it is said he is not acting by virtue of his office, when he seizes the goods of a person against whom he has no process. But, taking into consideration the difference between the duties of a sheriff with process in his hands or without it and the duty of an auditor charged generally with the issuance of all negotiable bonds that have been duly authorized by law, and the application of even the reasoning which is invoked in behalf of the sureties in the case of the sheriff becomes wholly impertinent and inapt in its relation to the duty of the auditor. In the case of Wayne v. Bank, 52 Pa. St. 343, where the teller of the bank had authority to issue duebills, and he issued duebills to raise money for his own private use, it was held that his sureties were liable. See, also, Bank v. Auth, 87 Pa. St. 419. The distinction that was made in the argument of this case that bank tellers are put into office for the purpose of dealing with the public at large, and that their duties in that respect are different from the duties of an auditor of the state of Ohio, seems to me to be only a difference in the details, and not in the essential nature of their respective positions in their relation to this question; and that the underlying principle that governs in both cases is precisely the same, namely, that in the issuance of the paper of a corporation, whether of a county or a bank, that one charged with the duty of putting it out must act faithfully and honestly in

the doing of that thing. I have not been able to see the case of State v. Newell, 2 Ohio Cir. Ct. R. 203, but it is cited by the plaintiff's counsel as pertinent to this case. Upon the authority, among others, of State v. Jennings, 4 Ohio St. 418, already cited, and with an especial approval of the opinion of Judge Thurman in that case, the supreme court of the United States has thrown the great weight of its authority in favor of the doctrine of New York, Ohio, and other states, and against the contrary view, by deciding that a marshal of the United States, having process in his hands against one person, who seizes the goods of another, is liable by virtue of his office, and his sureties are bound. Lammon v. Feusier, 111 U. S. 17, 4 Sup. Ct. 286. This case is cited with approval, incidentally, in Covell v. Heyman, 111 U. S. 176, 181, 4 Sup. Ct. 355, and again in Lamar v. McCullough, 115 U. S. 163, 187, 6 Sup. Ct. 1, in which this language is used:

"In Lammon v. Feusier, 111 U. S. 17, 4 Sup. Ct. 286, where a marshal having attachment against the property of one person levied it on the property of a stranger, it was held by this court that the sureties on the official bond of the marshal were liable to the stranger because the marshal had acted colore officii although he had acted without sufficient warrant."

See, also, West v. Cabell, 153 U. S. 78, 14 Sup. Ct. 752.

Just as this auditor acted in the overissue of these bonds, without any actual authority. That was not only under color of his office, but in the discharge of the very duties which the statute in express words required of him. Rev. St. Ohio, §§ 1021, 1034, 4482. It is also made a penal offense for him to do that thing which he did. Rev. St. Ohio, § 6910. But I quite agree with the position taken by defendants' counsel that this latter section adds nothing to the force or effect of this bond. The sureties are not any more to be held liable because of that section than they would have been without it. Commissioners v. Bank of Findley, 32 Ohio St. 194; McConnell v. Simpson, 36 Fed. 750. But still it demonstrates that the legislature of Ohio has in the most emphatic method declared its own construction of the meaning of this bond, and of the meaning of the statutes of Ohio which devolve duties upon the auditor in respect of this particular function of issuing negotiable bonds. It was deemed advisable, in compelling the officer to act faithfully and honestly in such a matter, to enforce that fidelity and honesty by criminal penalties; and, while the penal statute adds nothing to the civil bond, it is a very important circumstance to evince the solution that the legislature of Ohio gives to the question whether such conduct is ex virtute officii or colore officii, or so much on the outside that it does not belong to the office at all. It is a legislative construction of the laws of Ohio and of the official bonds that are required to be given. It punishes the officer for a malfeasance in office also, even if it is a punishment to the individual as well for an offense against him who is injured. It goes to both wrongs. It is said by Judge Wallace in Bernard v. Bowe, 41 Fed. 30, 31, that the authorities are overwhelming to the effect that whatever is an attempt to perform an official duty in the execution of process is an official act. How much more surely is it an official act for an auditor charged with the duty

of placing his seal and signature upon bonds of the county to attest their genuineness to the commercial world, if he put that attestation upon bonds which are not the genuine obligations of the county? It may be said in behalf of the sheriff or marshal that the law always requires him to have in his hands process as special authority to make levies and seizures or arrests, and that is a physical indication of his authority, and the only authority he can have, his only source of power to act, and which is open to any one to demand and see and inspect. If, therefore, in the entire absence of such process, he seizes the goods of a citizen, and this can be held to be an official act, how much more clearly is it an official act in the case of an auditor, who has at any and at all times, everywhere, the power to write his own official signature as that of the county, and the possession of its official seal, and these become at any and all times, and under all circumstances, the insignia of his authority, and the symbol of his honesty and his county's as well. He is never without them, as the sheriff or marshal may be when there is no process in their hands, and therefore it is much more easy for the auditor to put the appearance of genuine sanction to his act than it is for the marshal or the sheriff. And therefore it seems to me that it is the much more certain to say that the auditor is in the discharge of his official duty when he signs and attests a fraudulent bond than it is to say that the sheriff or marshal is in the exercise of his office when he makes a false levy.

Other authorities might be cited from the state and federal courts to sustain the ruling we make,—that, where there is no limitation in the language of the bond itself or its recitals, and no limitation in the statutes conferring the authority upon the officer to do the thing, that which is done is done by virtue of his office, or is at least so, to state it more clearly, whenever, if the thing which he does were done genuinely and honestly, it would be an official act; so that, if he be authorized to issue genuine bonds by affixing his signature and seal, if he affixes that signature and seal to fraudulent bonds, it is an official act, for which he and his sureties are liable. Demurrer overruled.