# DECISIONS

## OF THE

# Court of Appeals of Kentucky

---

## Vansant, et al. v. Commonwealth, ex Rel.

### (Decided March 5, 1920.)

## Appeal from Franklin Circuit Court.

1. Schools and School Districts—Bond of Superintendent of Public Instruction—Subsequent Legislative Act—Liability of Sureties.— The Superintendent of Public Instruction executed a bond for the faithful performance of his duties in such capacity, and during his term of office the legislature passed an act making the Superintendent Special State Inspector and Examiner of Schools, voting him a salary for the latter purpose. Before entering upon his duties under the new act he was required to execute a bond distinct from the first bond mentioned. The sureties on his bond as superintendent were not bound for the performance of his duties under the later act.

2. Officers—Increase or Reduction of Compensation—Clerks.—The constitutional provision against increases of salaries of officers after their election applies only to officials and not to clerks.

3. Schools and School Districts—Unauthorized Printing of Superintendent of Public Instruction.—Under a statutory provision directing the superintendent to make a report of the condition of the common schools, etc., together with such other facts, statistics and information as may be deemed of interest to the public, the superintendent was without authority to have printed and charged to the school fund an official manual, arbor and bird day book or a bulletin on home economics.

4. Schools and School Districts—Illegal Expenditures—Pleading.— The allegation that certain expenditures were unlawful, wrongful and unauthorized and should not have been paid for out of the school fund were sufficiently definite and specific to charge an illegal use of the state funds and are not mere conclusions of the pleader.

5. Statutes—Construction.—The words "such other facts" found in a statute pertain to such only as are of the same kind or associated with those previously enumerated.

6. Statutes—Construction.—Where in a statute general words follow the enumeration or designation of particular or specific subjects such general words are not ordinarily construed in their broadest sense, but are presumed to be restricted by the particular designations and to apply to and include only persons or things of the same general kind or class as those specifically mentioned, unless a contrary purpose is clearly manifested.

7. Officers—Official Bonds—What Such Bond Includes—Sureties.— An official bond covers not merely the principal's ·wilful default but those resulting from want of care or lack of judgment. Sureties are liable for any derelictions in the performance of any statutory duty of the principal, or for improper conduct on the principal's part in the performance of imposed duties.

8. Officers—Sureties—Extent of Liability.—A public officer and his bond will be liable for any injury that may be sustained in consequence of the misfeasance, malfeasance or nonfeasance of such officer in respect to those duties imposed upon him. Not only do the sureties on an officer's bond agree that the official will faithfully perform the duties enjoined by law, but that he will not by virtue, or under color of his office, commit any illegal or improper act.

9. Officers—Bonds.—Bond for failure of performance of the duties of a public officer does not cover loss due to inevitable accident or vis major.

10. Officers—Bonds—Sureties—Liability of.—Where in an official bond the sureties covenant that the principal shall well, truly and faithfully discharge his duties as Superintendent of Public Instruction, the sureties are liable for misappropriation by the principal in the expenditure of funds for publications not authorized by the statute defining the principal's duties.

HAGER & STEWART, J. B. HANNAH and CLYDE MILLER for appellants.

CHARLES H. MORRIS, Attorney General, and JOHN C. DUFFY for appellee.

OPINION OF THE COURT BY JUDGE QUIN—Reversing.

At the regular election held in the month of November, 1911, Barksdale Hamlett was elected Superintendent of Public Instruction. On January 1, 1912, he qualified by taking the oath of office and executing bond in the sum of $25,000.00, with R. H. Vansant, John C. C. Mayo and D. W. Gardner as sureties, by which they covenanted with

the Commonwealth that Hamlett would well, truly and faithfully discharge the duties of his office, and would pay over to such officers and persons, and at such times as they might respectively be entitled to the same, all money that might come to his hands as such officer.

Suit was brought by the Commonwealth against Hamlett and his sureties to recover the sum of $64,-711.00. Hamlett's demurrer to the petition and amended petition was overruled, and having declined to plead further, judgment was rendered against him for the sum of $62,017.44. The motion of the sureties to make the petition more specific and their special and general demurrers to the petition and amended petition were overruled. Plaintiff's demurrer to the various paragraphs of the answer was sustained. The sureties having declined to plead further, judgment was rendered against them for the sum of $25,000.00 and costs. The sureties appeal.

In paragraph two of the petition it was sought to recover the sum of $1,395.00 paid to Hamlett as special state inspector and examiner of schools under the act approved March 8, 1912, chapter 12, Acts 1912, p. 91, now subsections 1 to 6 of section 4535f, Kentucky Statutes. This act was approved during Hamlett's term of office, and prior to its enactment his salary as Superintendent of Public Instruction was $2,500.00. By this act the Superintendent of Public Instruction was made special state inspector and examiner of all schools in cities, towns and counties in the Commonwealth, receiving funds directly or indirectly from the state. He was given the power to inspect and examine into the fiscal management and conduct of the office of all school officials, whose duty it was to receive, handle or disburse the public school funds, and to compel an accounting by such officials. To this end he was given authority to issue process, to compel the attendance of witnesses before him, to administer oaths, and to compel the witnesses to testify in any investigations he was authorized to make. In case he, or any of his assistants, found any mismanagement, misconduct, violation of law, or wrongful or improper use of any of the school funds, it was made his duty to report such violation to the state board of education and to call in the assistance of the county attorney or Commonwealth's attorney to assist in the indictment, prosecution and conviction of the accused. For such special duties

he was to receive a salary of $1,500.00. The act further provided that before entering upon such special duties he should execute bond with good and sufficient security, to be approved by the Governor in a sum not to exceed $10,000.00. The answer pleaded the provisions of the act, alleged that Hamlett, as such special state inspector and examiner, had executed the bond required by the act, and that the bond had been approved by the Governor. A copy of the bond wsa made a part of the answer. It is argued in behalf of the Commonwealth that as Hamlett's salary as Superintendent of Public Instruction was only $2,500.00 prior to his election, the act of March 12th, by which he was given a salary of $1,500.00 for special state inspector and examiner of schools, was invalid as to him because it contravened section 235 of the Constitution, providing that the salaries of public officers shall not be changed during the terms for which they are elected. In reply to this contention it is sufficient to say that the bond on which the defendants are sureties was executed prior to the enactment of the act of 1912, imposing upon the Superintendent of Public Instruction the new and additional duties required by the act. Not only so, but the act required a special bond covering the performance of the new duties, and this bond was executed by Hamlett. The additional salary which Hamlett received was paid after the execution of the special bond. Under these circumstances, the bond required of the defendants did not cover the new duties, and they are not liable for Hamlett's default in the performance of such duties. County Board of Education v. Bateman, 102 N. C. 52, 8 S. E. 882, 11 A. S. R. 708. It follows, therefore, that the answer of the defendants to the second paragraph of the petition presented a complete defense, and the demurrer thereto should have been overruled.

In paragraph three it is sought to recover of Hamlett and his sureties the sum of $6,916.67 paid to Mrs. Hamlett as clerk, on the ground that "she was not regularly employed as a clerk or in any other capacity in the department of education during said time, nor for any reasonable length of time." It was further sought to recover $2,916.67 of the above sum on the ground that it constituted an unlawful increase in Mrs. Hamlett's salary. The allegation that Mrs. Hamlett "was not regularly employed as a clerk, nor for any reasonable length of time" is not sufficient to show that she was not entitled to the salary because she did not perform the duties

of the clerkship. With respect to the contention that the payment of $2,000.00 per year to Mrs. Hamlett under the act of 1912 was an unlawful increase of salary, the following observations will be sufficient. The act of 1912 authorized the special state inspector and examiner to expend $2,000.00 for clerk hire. This money was not payable out of the salary of the superintendent, but was payable by the Commonwealth, and since the constitutional provision against increases in the salaries of officers after their election applies only to officers and not to clerks, the increase in Mrs. Hamlett's salary was valid. It follows that the demurrer to the third paragraph of the petition should have been sustained.

In paragraph four it is sought to recover the sum of $8,517.59, which Hamlett collected for a contingent and inspection expense, it being alleged that no portion of said amount was drawn from the school fund by Hamlett for the purpose of paying his legal and authorized expenses, but that all of it was unlawfully and wrongfully drawn from the school fund and appropriated by him for his own use and benefit. Section 4385a, Kentucky Statutes, authorizes the Superintendent of Public Instruction to incur an annual expense of $500.00, and this portion of the expense is covered by the item of $41.66 per month as set out in the itemized statement. The inspection expenses began with May, 1912, and must be presumed to have been incurred under the act of 1912, and for the reasons heretofore set out are not covered by the bond sued on. Of course, if Hamlett appropriated the $500.00 annually without incurring any expense in visiting the schools, the defendants would be liable, but the allegation that the sum sued for was not expended for the purpose of paying Hamlett's legal or authorized expenses, but that all said sums were unlawfully and wrongfully drawn from said fund and appropriated by him for his own use and benefit, was denied by the answer, thus making it an issue whether he incurred traveling expenses to the extent of $500.00 a year. Hence, the demurrer to the fourth paragraph of the answer should have been overruled, as it presented a complete defense.

In paragraph five it is alleged that Hamlett unlawfully and wrongfully paid out of the state school funds the sum of $28,037.47 for the publication of various books which he was not authorized by law to have published, and which should not have been paid for out of that fund.

The payments were made on different dates, but the books and amounts may be summarized as follows:

| | |
|---|---:|
| A Bulletin on Home Economics | $2,001.09 |
| Kentucky Official Manual and Educational Directory | 6,131.51 |
| Arbor and Bird Day book | 8,884.67 |
| History of Education in Kentucky | 9,265.32 |
| 4,000 cartons | 200.00 |
| Kentucky Educational Directory | 739.88 |
| Manual and Directory | 815.00 |

$28,037.47

To a proper understanding of the issue raised by this paragraph we call attention to the following applicable portions of the Kentucky Statutes in force during the period covered by the present litigation.

Section 4384 requires the Superintendent of Public Instruction to execute bond in the sum of $25,000.00 to the Commonwealth with good security for the faithful performance of his duties.

Section 4389: "He shall, biennially, on or before the meeting of the general assembly, make report of the condition, progress and prospects of the common schools; the amount and condition of the school fund; how its revenue for the two previous school years had been distributed; the amount produced and disbursed for common school purposes from local taxation or other sources, and how and for what the same was expended; an abstract of the county superintendents' reports, the practical workings of the common school system of the state, with suggestions as to any alterations it may require; all of which, together with *such other facts, statistics, and information as may be deemed of interest to be known,* he shall deliver to the contractor for the public printing, and cause to be printed a copy for each school district and for each county and city superintendent of schools in the state, seven hundred and fifty copies for the use of the members of the general assembly and for exchange with the superintendents of public instruction of other states, and five hundred copies for distribution by the superintendent according to his discretion."

Section 4395: "He shall have published, for annual distribution throughout the state, the general school laws of the state, abstracts of the decisions of the appellate courts and of the attorney general on points of school law

and construction thereof, decisions, rules and regulations of the state board of education and of the state board of examiners; plans and specifications for building school houses, information and instructions in regard to application of the school law and the management of the common schools; important official and legal periods of the school year, with due notice thereof; *and such other important facts and data as may be of interest to the public.*"

After denying that the publications set out in this paragraph of the petition were contrary to the statutes, the answer alleges they were within the purview of said sections. This affirmative plea is in turn denied in a reply, in which it is alleged that section 4389, *supra,* provides only for the publication of the superintendent's biennial report and what it shall contain; that said report was published as required by law, and contained all the facts, statistics, etc., provided by law. That the superintendent in compliance with section 4395 published the school laws as therein specified, it being further alleged that the publications set forth and complained of in the petition were separate and independent publications in no way related to either of the publications above mentioned and were not authorized by statute.

There is no pleading subsequent to this reply; no demurrer thereto, no order controverting of record. This was doubtless due to the fact that the case was disposed of on demurrer to the answer and will be so treated upon this submission.

It is alleged these expenditures were unlawful, wrongful and unauthorized, and said publications should not have been paid for out of the school fund. In other words that the statute authorized the printing of certain books, but not those enumerated in paragraph five, hence the diversion or appropriation of the school fund for such purposes was illegal and without warrant of law. These statements are not mere conclusions of the pleader, but allegations sufficiently definite and specific to charge an illegal use of state funds and could not well have been more definite or certain. Commonwealth v. McCormick, 177 Ky. 474, 484, 197 S. W. 977.

Each book is embellished with a full page photo of the superintendent and contains a slip or card stating that it is presented with his compliments.

The "History of Education in Kentucky" is a resume of the history of education in the state. It was issued as a supplement to the biennial report, its contents

are in keeping with the title, hence it could properly be included within the language of section 4389, as such other facts, statistics, and information as may be deemed of interest to be known.

The Kentucky Arbor and Bird Day book is a beautiful, expensive and handsomely bound volume of 149 pages, some of which are devoted to arbor day and birds, many to poetry, some to prose and a few to music. It contains a few cuts of some of our native birds. It is both interesting and entertaining and while it would doubtless appeal to the aesthete, it certainly was not within the purview of the statute. No more so than the Kentucky Statutes, or a book on zoography, zoology, mineralogy, forestry or any like work, a study or knowledge of any or all of which would be beneficial.

Indeed it partakes much of the nature of a text book, and as such surely was not within the contemplation of the law makers.

The Kentucky Official Manual and Educational Directory consists of 300 pages, and aside from some preliminary matters is a duplicate of the Kentucky Directory, a biennial publication edited by the state librarian. It contains the names of various officers of the Commonwealth, with biographical sketches thereof, the Democratic and Republican State Central Committees, the state Constitution, court calendars, rules of the senate and house of representatives, postal information and like data.

Home Economics is a pamphlet of 43 pages devoted to sewing, cooking and the care of the house. Within its covers will be found articles on such illuminating subjects as setting the table, serving a meal, cooking, washing dishes, helping in the home, etc. All doubtless very useful and valuable in their proper place.

We are convinced that neither of the two publications last above mentioned is embraced within the expression "and such other important facts and data as may be of interest to the public" found in section 4395, or "such other facts, statistics and information as may be deemed of interest to be known," as stated in section 4389.

It is not alleged the 4,000 cartons were not a part of the legitimate expenses of the office, therefore, the cost of same was properly chargeable to the school fund.

It will readily be seen that in section 4389, pertaining to a biennial report to the general assembly, and section 4395, providing for the annual distribution of the general school laws, etc., the context of the two sections is limited

to matters educational and of a general nature, such for example as the condition and welfare of the schools, the status of the school fund, with its receipts and disbursements, the practical working of the school systems with suggestions from the superintendent as to the changes in same; decisions, rules and regulations affecting the schools, plans for school buildings, applications of the school law and management of the common schools together with such other data as may be deemed of interest.

What are the "such other facts" referred to? Plainly only such as pertain to or are of the same kind or associated with those enumerated.

Where in a statute general words follow an enumeration or designation of particular or specific subjects, such general words are not to be construed, ordinarily, in their broadest sense, but will be presumed to be restricted by the particular designations, and to apply to and include only persons or things of the same general kind or class as those specifically mentioned unless a contrary purpose is clearly manifested.

They are deemed to have been used, not to the wide extent which they might bear if standing alone, but as related to words of more definite and particular meaning, with which they are associated. Lewis' Sutherland Stat. Cons., sec. 422; Black on Interp. of Laws, p. 141; 25 R. C. L., pp. 996, 997; 36 Cyc. 1118.

This is known as the rule or doctrine of *ejusdem generis,* because, as said in Black on Interp. of Laws, p. 141, "it teaches us that broad and comprehensive expressions in an act, such as 'and all others,' or 'any others,' are usually to be restricted to persons or things of the same kind or class with those specifically named in the preceding words. It is of frequent use and application in the interpretation of statutes." The text as given above is supported by many illustrative cases cited by the author.

In re Barre Water Co., 62 Vt. 27, 20 Atl. 109, 9 L. R. A. 195. Here it was held that the words "other purposes" in a charter granting the company the right to furnish water "for the extinguishment of fires and for domestic, sanitary and other purposes," meant other like purposes, or other like public purposes, and that furnishing power for running small motors for light manufacturing was not a use contemplated by the charter, the court saying:

"It is a maxim of greater or less universality of application, both in the construction of written instruments and of statutes, that general words may be aptly re-

stricted according to the persons or the subject matter to which they relate. Lord Hale's maxim of *noscitur a sociis* is akin to this, from which rule is deduced that the meaning of a word may be ascertained by reference to the meaning of words associated with it. And it is laid down by Lord Bacon that the coupling of words together shows that they are to be used in the same sense.''

State, ex rel v. Jackson, Trustee, 168 Ind. 384, 81 N. E. 62, was a suit to compel the township trustee to furnish free transportation for puplis of the school under a clause making provisions for the levying of a tax ''for the payment of other necessary expenses of the school.'' The court says:

''Applying this rule of '*ejusdem generis*' to the expression 'other necessary expenses' it must mean other expenses necessary and incident to providing school houses, furniture, apparatus, fuel and other things of like character. It is difficult to conceive that a legislature, sitting more than thirty years ago, contemplated by this expression that the transportation of pupils would be a necessary expense of the school.''

Section 2492, Kentucky Statutes, provides that persons furnishing labor, material, supplies or teams for the construction of a railroad shall have a lien thereon for the labor, etc., furnished. In Carson & Co. v. Shelton, et al., 128 Ky. 248, 107 S. W. 793, appellant asserted a lien for certain groceries and supplies purchased from him by appellee for the purpose of feeding his teams and his household, including certain ''hands'' employed in the work. In denynig the lien the court says:

''The things for which the statute gives a lien are labor, material, supplies, or teams for the construction of the railroad. The material referred to is that which enters into the construction of the railroad. The labor and teams are those used in the construction of the railroad. The word 'supplies' must receive a similar construction and must include such things as are used in the construction of the railroad. To construe it to refer to all supplies furnished to any subcontractor for his personal use or for the personal use of his hands, would be to entirely disregard the rule that, in construing statutes, a word is always construed in connection with the words with which it is associated, and, where several things are referred to, they are presumed to be of the same class, when connected by a copulative conjunction, unless a contrary intent appears. . . ''

To same effect see American Bridge Co. v. Glenmore Distillery Co., 32 R. 873, 107 S. W. 279; Smith v. Cochran, 7 Bush 149.

The only issue raised by paragraph five is as to whether the publications specified were such as come within the intendment of the two sections. We have answered this in the negative as to three of the publications.

Incidental to a decision of this proposition is the further question, the vital one here, of appellant's liability. The obligation of the bond is that Hamlett "will well, truly and faithfully perform the duties of the office. . . . "

Bonds containing provisions similar to the above have frequently been before the courts for consideration. In some of the decisions sureties have been absolved from liability where the alleged breach was due to a mere error in judgment or want of skill. Common Council of Alexandria v. Case, 2 Cranch (C. C.) 363; Bank of United States v. Brent, 2 Cranch (C. C.) 695; Union Bank v. Clossey, 10 Johns (N. Y.) 271; Wilson v. Spencer, et al., 74 Fed. 153; State v. Chadwick, et al., 10 Ore. 465, in which latter case it was said that whether appellant acted in good faith or not was a question for the jury, and it is intimated that before one could be held liable it is essential that it be found he acted wilfully or negligently. We do not believe this to be in accord with the great weight of authority.

The very object and purpose of official bonds is to afford security to the public interests and they are generally required of those officers whose lapses from duty and rectitude might be expected to affect injuriously, either the public finances, the due execution of the laws, or perhaps the private interest of individuals with whom such officers have any official relation. These bonds are universally considered the great safeguard of the public interest, as well as the surest remedy for private grievances. A public officer by accepting the trust tendered him through his appointment or election to office impliedly warrants that he has the capacity to fill the position, and the bond given by him covers not merely his wilful defaults, but those also resulting from want of care or lack of judgment. The public may exact full protection against all loss resulting directly or indirectly from the officer's conduct. Murfree on Official Bonds, sec. 310; Stearns on Suretyship, sec. 159. In the latter volume the author says:

"Whenever the law imposes upon a public officer the performance of ministerial duties, the public officer and his bond will be liable to any individual for any injury he may sustain in consequence of the misfeasance, malfeasance or nonfeasance of such officer in respect to those duties imposed upon him."

In Murfree on Official Bonds, sec. 476, it is said:

"The bond is a contract by which the officer and his sureties in effect covenant and agree not only that the officer will faithfully perform the duties enjoined by law, but that he will not by virtue, or under color of his office, commit any illegal or improper act."

The text from those two authors finds ample support in the many cases cited, extracts from some of the opinions being embodied in the text.

What then is comprehended by the expression, "faithful performance of one's official duties?"

In Minor, et al. v. Mechanics Bank of Alexandria, 1 Pet. 46, it was held to include not only honesty, but reasonable skill and diligence, the court saying:

"If the duties are performed negligently and unskillfully, if they are violated, from want of capacity or want of care, they can never be said to be 'well and truly executed.' "

It was held to be a stipulation against dishonesty, incompetence, ignorance and negligence, in Atlantic & North Carolina R. R. Co. v. Cowles, et al., 69 N. C. 59.

The sureties are liable for any dereliction in the performance of any statutory duty of the principal, it was said in Ramsey's Estate v. People, 197 Ill. 572, 64 S. E. 549, 90 Am. St. Rep. 177. Or for improper conduct on the principal's part in the performance of imposed duties. Mower County v. American Bonding Co., 133 Minn. 274, 158 N. W. 394.

In criticising the decision in Union Bank v. Clossey, 10 Johns (N. Y.) 271, intimating a contrary doctrine, the court in State Bank v. Locke, &c., 4 Dev. (N. C.) 529, said:

"It cannot be supposed that mere honesty of purpose, or rather the absence of dishonest intentions, on the part of the cashier, was all the state meant to require, but further, skill, diligence, punctuality—for those qualities are necessary to the duties on the discharge of which the success, nay the existence of the institution depended."

Holding that sureties do not stipulate for the principal's infallibility, but agree he will be careful and honest, the court in Mayor, &c. of Hoboken v. Evans, et al., 31 B. J. Law (2 Vroom.) 342 says:

"It is error to suppose that the agreement to perform the duties of the office faithfully means merely that the incumbent will not wilfully do any wrong act. It has a stretch beyond this, and is broken by neglect or by carelessness in the discharge of the official duty, as well as by an intentional misfeasance."

In Barrington v. Bank of Washington, 14 Serg. & Rawle (Pa.) 405, the contention was made that the conditions of a bond similar to that involved in this case, restrained the guarantee to acts of infidelity and dishonesty, and were so intended, and therefore, if the act be done ignorantly, but not dishonestly, however injurious it may be to the institution, however contrary to the official duties of the cashier, still, if there be no corrupt motive, the sureties were not liable, the court saying:

"While I admit the ingenuity, I cannot agree to the solidity of the argument. The covenant is, that the cashier will discharge the duties of his appointment; that is, with competent skill and abilities. A man who accepts an office or trust of any kind, contracts that he will exercise it with competent skill and ability, and his sureties who are bound that he will execute it according to his ability, warrant for the performance of this contract of the officer."

To the same general effect will be found Kammar v. Fensier, &c., 111 U. S. 17, 28 L. Ed. 537, 4 Sup. Ct. 286; National Bank of Redemption v. Rutledge, 84 Fed. 400; Governor for use, &c. v. Wiley, 14 Ala. 172; Norton v. Kempe, et al., 121 Ala. 446, 25 Sou. 841; Governor v. Dodd, 81 Ill. 162; Skinner v. Phillips, 4 Mass. (Tying) 68; American Bank v. Adams, 29 Mass. (12 Pick.) 303; Archer v. Noble, 3 Me. (Greenl.) 418; Harriss v. Harrison, et al., 11 Me. (2 Fairf.) 241; The People v. Brush, 6 Wend. (N. Y.) 456; Lee v. Charmley, 20 N. D. 570, 129 N. W. 448; Inman v. Sherill, 29 Okla. 100; Carmack v. Commonwealth, 5 Bin. (Pa.) 182; Richland County v. Owens, 92 S. C. 329, 75 S. E. 549.

Paxton, et al. v. Baum, et al., 59 Miss. 631, involved the liability of a county supervisor and his sureties for alleged misappropriations. The line between acts constituting liability and non-liability is pointed out. We quote from the opinion as follows:

"The objects to which money in the county treasury may be appropriated are designated by law, and it is not legally appropriable to any other purposes. If it is appropriated by the board of supervisors to some other object than is authorized by law, members are liable personally for it, unless they voted against such appropriation. It is for money appropriated to something for which the law does not permit it to be appropriated at all, in any way or under any circumstances, that members are personally liable. It is for a diversion of money from its legitimate objects, and not for appropriation to a proper object, although in an irregular or unauthorized manner, that liability is imposed on members personally. It is what the money is appropriated to, and not how it is applied, that furnishes the test of personal liability for it. 'Object' signifies the thing aimed at, the end sought to be accomplished. . . . The objects to which the boards may appropriate money are designated by law, and may be known to them; and, in all cases of doubt, they may resolve the doubt against the appropriation, and avoid risk of liability; and it may be supposed that for appropriations to objects not authorized by law, it was intended to make members of the board of suprevisors personally liable."

See also Boyd County v. Arthur, 118 Ky. 932, 26 R. 906, 82 S. W. 613; Flowers v. Logan County, 138 Ky. 59, 127 S. W. 512.

This court held in Harrison v. Shank, 13 Bush 620, that a sheriff was liable to the owner of property taken under execution to pay the debt of another, whether he had knowledge of the defective title or not, it being gross negligence on his part not to require an indemnifying bond.

In passing on the question of liability on a constable's bond it was said in Jewell v. Mills, &c., 3 Bush 62:

"For nonfeasance and unintentional misfeasance in office the constable and his sureties would unquestionably be responsible to the party injured, because such would be an official wrong."

It was further said there would be no liability for acts of violence committed by the constable.

An examination of the decisions herein cited will reveal the fact that the bonds construed were those of various officers in public, financial and commercial life. The breaches complained of consisted of acts of malfeasance, misfeasance and nonfeasance.

Suffice it to say that a bond for faithful performance would not cover losses due to inevitable accident or *vis major*. Other exceptions might be noted, but we do not deem it wise or expedient to undertake a recitation of same here.

Publication of such volumes as the Official Manual and Directory, the Arbor and Bird Day Book and bulletin on Home Economics were clearly not within the intendment of the statute. The expense thereby incurred was wrongful and unlawful; there was no authority for any such appropriation. A true and faithful discharge of the superintendent's duties was not evinced by the printing and distribution of the foregoing books. By no process of reasoning or stretch of the imagination could they be said to be works of the same nature, kind or character as the annual and biennial publications required by sections 4389 and 4395 Kentucky Statutes. We do not see how it can be seriously contended that the statute could be so interpreted as to find any semblance of authority for their issue. Nor do we understand how the superintendent, had he given any consideration to the statutes, could have been convinced or satisfied in his own mind that it was proper to publish them.

All doubt as to the proper construction of the statutes is or should be removed when we realize the fallacy of the interpretation sought by appellant. If, as stated in appellant's brief, the two sections of the statute are amply broad enough to cover the publications mentioned in paragraph five, then where, may we ask, would or could the limit of authority be placed?

If home economics, a state directory and birds are subjects so associated and related to the school facts, statistics and data specifically mentioned in said sections to be embraced therein, then by a parity of reasoning it would not have been improper had the superintendent invaded the fields of literature, art, science, history and others and published volumes without limit as to variety or scope, just so the cost did not exceed the amount set aside for state educational purposes. And could not he in this wise have dissipated the entire fund? If one was proper why not the others?

It will not do to excuse the misappropriation on the theory they were published through a mistaken authority, or an error of judgment. Sureties have been called upon to make good many defaults and breaches of their principals due to just such deviation from duty. The

expression "errors of judgment" covers a multitude of sins and derelictions.

We realize that occasions do and will arise when public officers are called upon to act quickly and to exercise certain discretionary powers and in which upon due reflection and sober thought it will appear they have exceeded their apparent authority. This is not the case before us. There was no haste incident to these publications; on the contrary, it is manifest that much time and expense were devoted to the preparation of each of them. Nor did the direction as to the selection of other facts kindred to or associated with those embraced in the statutes, authorize or warrant the production of these books. Practically the entire contents of each of the three sets could be found in other books; there was nothing original in their subject matter.

Under the facts disclosed by the pleadings the publication of the Kentucky Arbor and Bird Day Book, the Kentucky Official Manual and Educational Directory and the bulletin on Home Economics, was wrongful, unlawful and unauthorized. The lower court did not err in overruling the demurrer to the fifth paragraph of the petition, but did err in sustaining the demurrer to paragraph five of the answer, because some of the items charged were legal, yet to the extent indicated herein the Commonwealth was entitled to recover.

In the sixth paragraph it is sought to recover the sum of $19,864.33, alleged to have been unlawfully and wrongfully paid to clerks, stenographers and other employees. By sections 4385a and 4535f, being a part of the act of 1912, Hamlett was authorized to expend annually for clerk hire the sum of $5,350.00 in addition to the $2,000.00 paid to his wife. Hence, in order for the sixth paragraph to state a cause of action it was necessary to allege that, in addition to the $2,000.00 paid to Mrs. Hamlett annually, only $5,350.00 annually was available for clerk hire, and that in addition to that sum Hamlett expended $19,864.33. The demurrer to this paragraph should have been sustained.

The judgment is reversed for further proceedings in accordance with the views herein expressed.

Whole court sitting.

Chief Justice Carroll and Judges Thomas and Clarke dissenting.

DISSENTING OPINION BY CHIEF JUSTICE CARROLL.

I concur in the opinion except in so far as it charges the sureties with $2,001.09, the cost of the publication of bulletin on "Home Economics;" and $8,884.67, the cost of the publication of the "Arbor and Bird Day Book."

These items are discussed in the opinion in considering pargaraph five of the petition, and it will be noticed that a majority of the court found that the cost of the publication of the "History of Education in Kentucky" and "Kentucky Educational Directory and Manual and Directory," as well as the cost of 4,000 cartons, were expenses or charges within the reasonable discretion of the Superintendent of Public Instruction to create, but that he had no authority to charge the state with the publication of the bulletin on "Home Economics," "Kentucky Official Manual and Educational Directory," or "Arbor and Bird Day Book."

Sections 4389 and 4395 of the statute relate to and treat of separate and distinct duties imposed on the Superintendent of Public Instruction in the preparation and publication of matter that it was thought by the legislature would be useful in the development of the educational interest of the state.

There is no difficulty in the construction of section 4389, and its only pertinency to the question here involved lies in the fact that the legislature thought proper to make it the duty of the superintendent to prepare and have published in addition to the biennial report provided for in section 4389 the publications described in section 4395.

The publications authorized under section 4395 were intended, as the section declares, "for annual distribution throughout the state." The section does not place any limit on the size of the publications, or the number of pages they shall contain, or prescribe the kind of binding or covers that shall be used; all this detail was left to the discretion of the superintendent.

It does, however, specifically describe the nature of six of the publications and the character of information they shall contain, viz.: (1) The general school laws of the state. (2) Abstracts of the decisions of the appellate courts and of the attorney general on points of school law and construction thereof. (3) Decisions, rules and regulations of the state board of education and of the state board of examiners. (4) Plans and specifications for the

building of school houses. (5) Information and instruc-
tions in regard to the application of the school laws.
(6) Important official and legal periods of the school
year with due notice thereof; and, then authorizes the
publication of "such other important facts and data as
may be of interest to the public."

It will thus be seen that this section points out and
describes six publications that the superintendent shall
prepare and distribute throughout the state; but it does
not stop with these six publications; it further provides
that he shall have published and distributed "such
other important facts and data as may be of interest to
the public," and whether he had authority to have pub-
lished at the expense of the state the books styled
"Home Economics," "Arbor and Bird Day," depends
on the construction of the last and general clause in
section 4395, as neither of these publications is author-
ized by the other parts of the section.

It must be conceded that the legislature did not in-
tend to limit the publications the superintendent might
contract for at the expense of the state to the six sub-
jects mentioned in the section, as it expressly directs
him to prepare and publish such other "important facts
and data as may be of interest to the public," and we
may and do assume that it was under this direction that
the superintendent found authority for the publication of
the two books here in question. And so, as I look at it, the
only question is, did the publication of Home Economics
and Bird and Arbor Day Book, come fairly within the
scope of this broad discretion? If they did neither the
superintendent nor his sureties should be held liable for
the cost of the publications, because their publication
would not be a breach of the bond.

If however their publication was a gross abuse of the
discretion vested in the superintendent, then the publica-
tions would be a breach of the bond.

In considering this question it is important to have
in mind, that it is the duty of the superintendent, who is
the head of the educational system of the state, to con-
stantly keep in close touch with the growth and progress
of the state along material as well as educational lines,
so that the children of the state as well as its people who
are interested in educational affairs may acquire a
broader knowledge of things that may be useful and help-
ful to them in assisting to promote the material as well
as the purely educational development of the state.

In order that they might have this knowledge, so essential to create interest and application, it is the policy of the state to furnish through its state department of education to its pupil children and people, free of cost, the requisite information in the form of books, bulletins and pamphlets.

To the good judgment and sound discretion of the superintendent the legislature committed in the broadest manner the subject matter these publications should contain.

I of course concede that the superintendent cannot have published any book or pamphlet that his fancy might dictate, or that would be foreign to subjects that do not have general educational value; although it must be confessed that it would be extremely difficult if not wholly impossible to set down with certainty what publications might or might not fall within the scope of ''such other important facts and data as may be of interest to the public.''

Manifestly it was not intended to limit the publication to matters of a purely educational nature, such as are regarded essential parts of the common school education, because ample provision is made in other statutes for the publication and distribution of this character of information.

The legislature knew that there were many things that the children and people of the state should have a knowledge of outside of that to be gained by the study of what are commonly known as school books; that mere ''book learning'' would only supply a small part of the knowldege so essential in the life of today; that there were many thousands to whom this knowledge would never come unless it was a free gift, and so provision was made for its preparation, publication and distribution at the expense of the state.

The superintendent of schools was left to determine for himself the subject matter of these publications; the only limit on his authority was that they must have an educational value, and be within the broad meaning that education embraces under modern conditions.

Looking at it in this way, everybody must admit that the progress in the social, economical and commercial life of our people makes it necessary that the children and the people of the state shall have information concerning new things, that will enable them to appreciate and understand the new conditions that surround them.

This is well illustrated in the constantly changing school curriculum. Many branches of study are now being taught that had no place in the early educational history of the state, and I doubt not that many subjects now unheard of will in future years be as commonplace as those that are now on every tongue.

In response to this new demand, I think the superintendent did not exceed his large discretion in publishing the books in question. Possibly they might have been published in less expensive style and at much less cost than they were, but if the power to publish them is conceded, clearly the sureties on the bond should not be held liable, because the superintendent in an effort to make them more attractive and impressive thought it wise to have them printed on fine paper and bound in a substantial manner.

When a public officer has a discretion that he may exercise, there should be no liability on his bond, unless he is guilty of a gross abuse of it. The undertaking of the sureties should not be enlarged or any liability on their part created on account of the liberal use of the discretion lodged in their principal. When a public officer has a discretion it should plainly be made to appear that he has gone outside the fair bounds of it, before his bond can suffer. If there is doubt the surety should have the benefit of it.

Influenced by these briefly stated considerations, I am convinced that in the publication of these books the superintendent did not exceed his reasonable discretion, and that in holding his bond liable the court has applied an unjust and unreasonable rule.

Judges Thomas and Clarke join me in this dissent.